SHAVERS v ATTORNEY GENERAL

Docket Nos. 57931, 57935, 57916, 57934. Argued March 3, 1977 (Calendar Nos. 14–17).—Decided June, 1978. Application for rehearing filed August 31, 1978.

This appeal, popularly known as the "no-fault case", concerns the constitutionality of the no-fault motor vehicle insurance act.

Catherine Shavers and other plaintiffs brought an action for declaratory judgment against the Attorney General, the Secre-

REFERENCES FOR POINTS IN HEADNOTES

[1–5, 7, 11, 12, 14–17, 19–24, 26, 28, 29, 31, 34, 35, 37, 38, 41–44] Am Jur 2d, New Topic Service, No-Fault Insurance §§ 1, 12, 13.

[1, 11, 16, 17, 28, 29] 16 Am Jur 2d, Constitutional Law §§ 259 *et seq.*, 490.

[1–5, 7, 11, 12, 14–17, 19–24, 26, 28, 29, 31, 34, 35, 37, 38, 41–44] Validity and construction of "no-fault" automobile insurance plans. 42 ALR3d 229.

[2–5, 11–24, 30–38, 41, 42, 44] 16 Am Jur 2d, Constitutional Law § 490. Am Jur 2d, New Topic Service, No-Fault Insurance §§ 14, 16, 27.

[3, 20, 21, 22, 32, 33, 35] Am Jur 2d, New Topic Service, No-Fault Insurance §§ 4, 34.

[4] Am Jur 2d, New Topic Service, No-Fault Insurance §§ 2, 23, 24.

[6, 7] 16 Am Jur 2d, Constitutional Law § 127.

[7] 22 Am Jur 2d, Declaratory Judgments § 83.

[8–10, 25, 26] 22 Am Jur 2d, Declaratory Judgments §§ 10–12, 50.

[9, 26] 22 Am Jur 2d, Declaratory Judgments § 11.

[10, 25] 22 Am Jur 2d, Declaratory Judgments §§ 79–86.

[11, 21, 31, 34] Am Jur 2d, New Topic Service, No-Fault Insurance § 2.

[13] 16 Am Jur 2d, Constitutional Law § 356 *et seq.*

[18, 19] 16 Am Jur 2d, Constitutional Law §§ 384, 385.

[19, 22, 23, 35–38] 16 Am Jur 2d, Constitutional Law §§ 500, 501.

[22] Am Jur 2d, New Topic Service, No-Fault Insurance § 21.

[23, 38] Am Jur 2d, New Topic Service, No-Fault Insurance § 17.

[24, 37] Am Jur 2d, New Topic Service, No-Fault Insurance § 25 *et seq.*

[27] 16 Am Jur 2d, Constitutional Law § 115 *et seq.*

[30] 16 Am Jur 2d, Constitutional Law § 6.

[32] 16 Am Jur 2d, Constitutional Law § 548 *et seq.*

[34] 16 Am Jur 2d, Constitutional Law §§ 542, 545, 550.

[39] 16 Am Jur 2d, Constitutional Law § 144 *et seq.*

[40] 16 Am Jur 2d, Constitutional Law §§ 225, 226.

[43] 22 Am Jur 2d, Declaratory Judgments § 25.

tary of State, the Commissioner of Insurance, and several insurance companies challenging the constitutionality of the no-fault motor vehicle insurance act, 1972 PA 294. Some of the defendants filed cross-complaints. The Wayne Circuit Court, Horace W. Gilmore, J., granted a declaratory judgment which generally upheld the personal injury provisions which replace the system of tort reparations, but found unconstitutional property damage provisions and certain other provisions. The Court of Appeals, Lesinski, C.J., and Quinn, J. (T. M. Burns, J., concurring), vacated some of the circuit court's findings on the grounds that the plaintiffs lacked standing to raise those issues, agreed that the property damage provision is unconstitutional, and reversed the finding that the exclusion of motorcycles from the act is unconstitutional insofar as it concerns a justiciable issue (Docket Nos. 21238-21239, 22918). The parties appeal. *Held:*

The no-fault insurance act is constitutional insofar as it provides insurance benefits to victims of motor vehicle accidents as a substitute for tort remedies which it partially abolishes. However, the mechanisms controlling the ratemaking procedure are constitutionally inadequate in three respects. (1) The Legislature and/or the Commissioner of Insurance have not given substantial meaning to the statutory exhortation that "rates shall not be excessive, inadequate or unfairly discriminatory". (2) There are inadequate statutory provisions for a motorist to attack an individual rating decision. (3) There is no adequate statutory provision for a motorist to challenge insurance refusal, discriminatory cancellation, or assignment to the Automobile Placement Facility. The act will remain in effect for 18 months, and during this period the Legislature and Commissioner of Insurance may remedy the constitutional deficiencies in the act. The Court will then re-examine the matter to determine if the constitutional deficiencies have been remedied, and will enter an appropriate order.

1. The plaintiffs do not have standing as taxpayers to raise constitutional objections to the no-fault insurance act because the act does not, on its face, contemplate the expenditure of state funds. The court rule and statute governing taxpayers' actions do not give taxpayers standing to test constitutionality of an entire act when the expenditure of state funds is incidental.

2. Declaratory judgment is intended to provide a broad, flexible remedy to make the courts more serviceable to the people. An "actual controversy", which is a condition precedent to invocation of declaratory relief, exists where the declaratory

judgment is necessary to guide a plaintiff's future conduct in order to preserve his or her legal rights. A court may not decide hypothetical issues, but is not precluded from reaching issues before actual injuries or losses have occurred. The plaintiff must, at a minimum, plead facts alleging an actual justiciable controversy and prove each fact alleged to show an adverse enough interest to sharpen the issues raised. In this case the parties have standing to raise the following issues: (1) whether the compulsory insurance provision is constitutional; (2) whether the personal injury protection scheme violates due process or equal protection; (3) whether the property damage protection scheme violates due process or equal protection; (4) whether the exclusion of two-wheel motor vehicles from coverage under the act violates equal protection; (5) whether the work-loss and replacement services reimbursement scheme violates equal protection; and (6) whether the nonresident motorist scheme violates due process or equal protection.

3. The requirement that all motorists carry no-fault insurance is within the authority of the Legislature under the police power of the state to protect the general welfare of the public. The compulsory no-fault coverage insures not only the driver of a motor vehicle, but also passengers, pedestrians, owners of fixed property, and owners of properly parked vehicles. Furthermore, the operation of a motor vehicle, even when it affects no one but the driver, results in serious and immediate danger to a large segment of society.

4. In choosing to make no-fault insurance compulsory for all motorists, the Legislature has made the registration and operation of a motor vehicle dependent on whether no-fault insurance is available at fair and equitable rates. In effect, insurance companies are the instruments by which the Legislature carries out a scheme for the general welfare. This is not merely a grant of a monopoly to a utility. There exists a sufficiently close nexus between the state and the action of the insurance companies in setting rates that their action may fairly be treated as that of the state itself to invoke due process protection. Although this issue does not involve any traditionally recognized common-law or constitutional right, the concepts of "liberty" and "property" protected by due process are not to be defined in a narrow or technical sense, but depend on the extent to which government activity has fostered citizens' dependence and reliance on that activity. The Legislature has made the registration and operation of a motor vehicle, which vitally affects important aspects of day-to-day life, dependent on the availability of compulsory coverage at fair and equitable rates.

The Legislature has, additionally, fostered the expectation that no-fault insurance will be available at fair and equitable rates. The Insurance Code states that rates shall not be excessive, inadequate, or unfairly discriminatory, and provides a guarantee that no-fault insurance coverage will be available to any person who is unable to procure such insurance through ordinary methods.

5. No-fault insurance does not satisfy the constitutional requirement of due process unless, at a minimum:

(1) The Legislature and/or the Commissioner of Insurance (pursuant to his present rule-making authority) give substantial meaning to the statutory standards "rates shall not be excessive, inadequate or unfairly discriminatory".

(2) A filed rate, or a rate determined on administrative or judicial review, provides and sets forth:

(a) premiums reasonable to insured and insurer for the specific insurance coverage without regard to factors assertedly warranting differences in premiums among those insured;

(b) the factors which properly may be considered by the insurer in differentiating premiums among those insured; and

(c) the amount of differential appropriate for each such factor.

(3) Such information about each insurer is publicized in such a manner that every person affected can readily ascertain the factors and amounts of differentials applicable and calculate the premium the insurer may charge.

(4) Every motorist has the opportunity to obtain a prompt and effective administrative review of an insurer's calculation of the factors, differentials and premium applicable as well as a prompt and effective administrative review of the basis for the refusal or cancellation of insurance.

6. The holding that the compulsory insurance requirement is unconstitutional is effective 18 months from the issuance of this opinion. During the interim: (1) The Legislature and the Insurance Commissioner may take whatever action they deem necessary to remedy the due process deficiencies in the rate-making procedure; (2) Motorists will be required to obtain no-fault insurance as a condition precedent to registering and operating a motor vehicle; and (3) The no-fault act's constitutionally valid provisions, as declared in this opinion and subsequent opinions, will remain in effect. Until there is legislative or agency response to the due process deficiencies, the Commissioner of Insurance shall actively enforce the present regulatory scheme in the spirit of this opinion in order to assure the

availability of no-fault insurance at fair and equitable rates. All rights accrued by individuals against their insurers or against the Automobile Placement Facility until the order in this case is entered remain valid.

7. The remaining constitutional issues involve due process and equal protection challenges to various provisions of the no-fault act. The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective. The equal protection test is, essentially, the same. The challenged legislative judgment is accorded a presumption of constitutionality and judicial inquiry is restricted to whether any state of facts either known or which could reasonably be assumed supports the legislative judgment. The remaining constitutional questions, which deal with facts relating to particular commercial or industrial conditions, complicated statistics, and actuarial facts of the motor vehicle insurance trade or business should be predicated on the factual record developed at trial.

8. The traditional due process test, namely whether the legislation bears a reasonable relationship to a permissible legislative objective, must be applied to the personal injury protection scheme. The Legislature need not provide an adequate substitute remedy before abolishing a common-law cause of action. The record shows that the former tort system of remedy for personal injury resulting from automobile accidents had several operational deficiencies: many persons injured in automobile accidents received no reparations under the tort system because to collect damages under that system the injured person had to be free of any contributory negligence and the accident must have been caused by a person adjudged to be at fault; minor injuries were often over-compensated and serious injuries often under-compensated; lengthy delays were often encountered in compensating those injured in automobile accidents in cases where the need for prompt compensation was the strongest; the system imposed a heavy burden on the state's courts; and recovery under the tort liability system discriminated against the uneducated and persons of low income. The no-fault personal injury protection scheme reasonably relates to the legislative purpose of correcting those evils. The legislative judgment to limit the experiment in personal injury reparation to victims of accidents involving motor vehicles is justified under the traditional equal protection test by the frequent and serious injury to persons and property resulting from the use of motor vehicles. The creation of two classes of motor vehicle

accident victims, permitting those above the statutory "threshold" to sue in tort for their injuries, does not violate equal protection. This classification, along with the penalties imposed by § 3102(2) of the act, serves as an incentive for compliance with the compulsory insurance provision because an uninsured motorist may be liable in tort for all injuries suffered by the victim. Uninsured persons injured by uninsured motorists may obtain personal injury benefits under the Assigned Claims Facility.

9. Although the switch from property damage liability coverage to collision coverage may yield some increase in the efficiency of payments, it is apparent from a review of the record that the tort system provided relatively prompt equitable compensation for damage to property resulting from motor vehicle accidents. However, the Legislature is as free to experiment with other ways of dealing with a subject in the hope of making a good system better as it is to correct a perceived evil. Testimony at trial established that the Legislature anticipated that the abolition of a tort action for property damage would ultimately result in lower and more equitable premiums. The fact that these effects are not yet evident does not diminish the legitimacy of the goals sought to be achieved or the reasonableness of the means adopted. The important consideration for the Court is to determine whether, in adopting this legislation, there existed at the time of passage a legitimate legislative purpose reasonably related to the statute. The no-fault act's property damage protection provisions meet this test. These provisions reasonably relate to the valid public purposes of creating an incentive to build safer motor vehicles, encouraging group rates, and reducing costs by eliminating the necessity of accident "fault" investigation.

10. Section 3121 of the no-fault act provides that property protection insurance benefits paid under one policy for all damage to tangible property resulting from an accident shall not exceed $1,000,000. This limit violates neither the Due Process nor the Equal Protection Clause. It appears from the record that the Legislature sought to limit the absolute liability of insurance companies. The choice of a $1,000,000 limit was justified from an actuarial standpoint.

11. The record shows that motorcycles are rarely at fault in accidents, and that the inclusion of motorcycles in a no-fault system would result in insurance premiums so high as to preclude most motorcyclists from purchasing insurance. The challenged exclusion of motorcycles from coverage under the

no-fault act is reasonably related to legitimate interests. Therefore, § 3102(2) of the act does not violate equal protection.

12. The plaintiffs complain that § 3107 of the act violates equal protection of the laws because it discriminates between workers in the home and those outside the home insofar as maximum benefits payable in case of injury are concerned. Plaintiffs similarly allege that this section restricts recovery for injuries of those employed in the home to expenses "reasonably incurred" for replacement services. The trial court did not hear testimony on this issue but based its decision on stipulations of fact made at the pretrial conference; these stipulations did not provide an adequate factual context for determining the issue. Therefore, the Court remands to the trial court so that evidence may be received and adjudged under the "traditional" equal protection test.

13. The trial court's finding that the statutory scheme concerning transient nonresident motorists and nonresident occupants of motor vehicles not registered in Michigan violates due process and equal protection was not based on adequate evidence. Therefore, the Court remands to the trial court so that evidence may be received and adjudged under the "traditional" due process and equal protection tests.

The decision of the Court of Appeals is affirmed in part and reversed in part. Remanded to the trial court for further development of the record.

Justice Ryan, who was joined by Justice Coleman, concurring in part and dissenting in part, would at this juncture uphold the constitutionality of the entire no-fault insurance act.

1. The requirement of an "actual controversy" for a declaratory judgment means something more than simply the plaintiffs' "need to know" in order to guide their future conduct. It connotes the pursuance of an honest and actual antagonistic assertion of right by one party against another. A noncollusive adversary proceeding, as distinguished from a contrived friendly lawsuit, is critical, both pragmatically and constitutionally. The plaintiffs have the requisite standing to raise the issues addressed in the opinion of the Court because of the compulsory nature of the no-fault scheme. The pleadings allege that some of the parties are financially unable to buy the required insurance coverage and in this limited respect they are in a position adverse to the defendant state officials whose duty it is to implement the mandatory coverage provisions.

2. A party wishing to make a claim of unconstitutionality of the compulsory no-fault insurance scheme must raise it on appeal before the court of appellate review. The Court has

ignored this elemental precept of the appellate function and addressed the question *sua sponte* "because of its basic threshold importance to any decision" as to the no-fault act's constitutionality. The act, currently in its experimental stages, is novel legislation affecting millions of people and a billion-dollar industry in ways utterly beyond the ability of the Court to see. It is imperative that the Court proceed in a carefully informed manner before declaring upon the constitutionality of the compulsory no-fault insurance scheme. In the absence of any evidence in the record, briefs or arguments on the adequacy of casualty insurance regulation the Court has assumed the role of an advocate and made a strictly facial attack on the constitutionality of the compulsory scheme of the no-fault act.

3. The Legislature may constitutionally condition the operation of a motor vehicle upon the procurement of no-fault personal injury and property damage protection insurance. Under the police power the state may regulate travel upon its public highways. This control properly incudes the state's interest in mitigating the detrimental consequences of motor vehicle accidents through legislation designed to insure a party's financial responsibility to others as well as to himself. The no-fault scheme is also an integral part of the authority and interest of the state in licensing motor vehicle operators and the vehicles they own and operate. The Legislature is vested with wide discretion to determine what is fairly designed to protect the public against the evils which might otherwise occur. The expediency, the wisdom, or the desirability of the means adopted by the Legislature to advance legitimate public interests is strictly within the discretion of the Legislature, providing the means chosen do not offend constitutional safeguards.

4. The fundamental error in the reasoning of the Court is in the assumption that there is a property interest or entitlement, in the constitutional sense, in the availability of no-fault insurance at fair and equitable rates. This interest is identified by the majority as a "statutory entitlement", because there is no evidentiary basis upon which to predicate the assumption of the claim of unavailability of insurance, nor even appellate argument claiming it. A statute creates an entitlement claim to a governmental benefit if it defines the conditions under which the benefit must be granted or if it sets out the specific and sole conditions under which the benefit may be denied. Once the cognizable benefit is conferred or received, the individual beneficiary has a sufficient property interest in the benefit to warrant due process protection in the event the government attempts to withhold or deny the benefit. Underlying this

concept of a property interest to which there is an entitlement is the rationale that the recipients of governmental benefits place a reliance upon the continued receipt of those benefits which must not arbitrarily be undermined. There is a failure by the Court to recognize that the property interest to which a citizen has an entitlement and which is involved in this case derives from the action of the state in registering or licensing a motor vehicle, a benefit which, once conferred, permits the use of a motor vehicle on the public highways. The concept of the *present enjoyment* of the benefit appears to be an essential attribute of the protected interest in property under the entitlement doctrine, consistent with the rationale of the recipient's dependency and reliance upon the government activity. The compulsory insurance requirement does not terminate or abridge a person's entitlement to the benefits of registering a vehicle but merely defines, in part, the perimeters or dimensions of the benefit. The requirement of no-fault insurance simply conditions or defines one aspect of the eligibility for the benefit. Until an individual fulfills the requirement, he does not have a valid claim of entitlement to operate his vehicle in Michigan. So long as the statutory requirement is not palpably arbitrary or unreasonable, it does not offend due process.

5. To suggest that by enacting a regulatory scheme for making insurance rates "fair and equitable", the Legislature established a property interest in the subject matter of the regulation is constitutionally unsound. But even if it did there has been no showing that the compulsory insurance provision of the act either terminates or abridges the continued enjoyment of such an interest. The action of the Court in declaring the compulsory insurance scheme unconstitutional is an anomalous approach to assuring procedural safeguards for the enjoyment of the benefits of fair and equitable insurance rates. It elevates a concern for the *potential* unfairness of the compulsory insurance provision of the act to the level of a constitutional shortcoming to justify judicial veto. The Court has strayed from the constitutional limits of its judicial authority and usurped the legislative function. There is a difference between the Court's *power* to make today's judgment of unconstitutionality and its proper authority to do so.

6. Justice Ryan concurred with the majority opinion as to the applicable tests of due process and equal protection and as to the constitutionality of the personal injury protection scheme.

7. As to the property damage provisions, in accordance with the traditional test of due process, the only inquiry is whether the statute bears a reasonable relation to a permissible legisla-

tive objective. In addition to the goal of fixing financial responsibility for damage inflicted to tangible property, the Legislature had other goals in mind. One of them involved cost considerations. The Legislature sought to make vehicle protection coverage more equitable by allocating premium expense for that protection exclusively to first-party collision coverage. Essentially, there is a resultant shift in insurance premiums from the liability coverage to the vehicle collision coverage. With this shift the Legislature intended that premiums would more closely reflect the value of the vehicle one drives while affording a more significant premium saving to one who does not purchase the optional first-party vehicle coverage. Additionally, the Legislature hoped that this shift from liability to first-party coverage might make group insurance feasible as well as create incentives for more crashworthy motor vehicles. Including moving vehicles within the general tangible property class and affording them third-party property protection benefits would interfere with these objectives without significantly advancing the interest of financial responsibility.

8. Justice Ryan concurred with the majority opinion that exclusion of motorcycles from coverage under the act is constitutional.

9. Equal protection guarantees mean that the Legislature may not take what may be termed a "natural class of persons", split that class in two, and then arbitrarily designate the severed factions of the original unit as two classes and enact different rules for their treatment, but when there is a natural difference between the situation or circumstances of the two classes of persons, the Legislature may be justified in treating them differently. There is a practical reason for the Legislature to make a distinction between benefits for work loss and the replacement of ordinary and necessary services. Reimbursement for the former lends itself to determination on the basis of a person's prior wage scale, while ordinary and necessary services performed in the home are not susceptible of valuation under the same criterion. Moreover, one cannot ordinarily incur the cost of a substitute to perform the job of the accident victim. Additionally, the statutory requirement that the ordinary and necessary services must be incurred before reimbursement serves a prophylactic function which has not been shown to be unreasonable. Finally, the different maximum limits imposed by the act appear reasonably related to their reimbursement functions. There is no need for a remand of this matter for the taking of evidence.

10. Exclusion of transient nonresident motorists merely rec-

ognizes the realities of the situation. The Legislature, cognizant of the extent of its authority over out-of-state motor vehicles, reasonably excludes from the mandatory coverage scheme out-of-state motor vehicles which are not operated in Michigan for an aggregate of more than 30 days in any calendar year. Those nonresidents who do not voluntarily procure the no-fault coverage quite reasonably do not receive the concomitant no-fault benefits. Under the traditional test, legislation is presumed to be constitutional if any state of facts reasonably may be construed to justify the legislative action and the classifications in it. From the record made below, it does not appear that the presumption is overcome. No benefit has been shown to be gained by a remand of this issue for further trial court action.

11. The proper discharge of the judicial function, when evaluating new legislation for constitutional validity, is very narrow. It is to determine whether there is any rational relationship between the goals sought to be accomplished and the means chosen. Review and judgment by the Court must be such as to not hamper unduly the Legislature's freedom to experiment and innovate by superposing the Court's judgment as to the expediency or wisdom of legislation over theirs. This case was brought one month before the act became effective and is necessarily deficient in presenting evidence of the actual impact of the no-fault scheme. The plaintiffs produced before the trial court a body of evidence similar to that considered by the Legislature when that body was deliberating upon the propriety of adopting the scheme. Much of the evidence is imprecise, even highly speculative. Upon examining all of it, considering the findings of fact by the trial court, and applying established principles of constitutional law, over all of which is superimposed the presumption of constitutional validity, Justice Ryan is persuaded that the act is constitutionally sound.

Justice Fitzgerald, concurring in part, would hold at this time that the no-fault insurance act, under the traditional due process and equal protection standards, is a reasonable legislative method of assuring that victims of automobile accidents are promptly and adequately compensated. Because this case is an action for declaratory judgment, nothing would be gained from remanding for further fact-finding on the plaintiffs' perception of the evils of a system which is not beyond the experimental stages. The procedural due process issue, whether or not adequate guidelines are provided for rate setting, is not properly before the Court because the plaintiffs did not challenge in their appeal to this Court the failure to provide a mechanism for due process in rate regulation or insurance

availability. Assuming *arguendo* that this issue were before the Court, a constitutional due-process violation cannot be found without a factual record. Due process does not exist in a vacuum. Furthermore, the law on the entitlement doctrine is not so clear but that an adversary presentation is necessary to decide whether an entitlement exists and whether the requisite state action is present, and for a balancing of the interests of consumers, insurance companies, and the Insurance Bureau before deciding what is minimally required to satisfy due process. Judicial action at this time may precipitate a crisis in automobile insurance at the risk of hasty and ill-conceived reform. The Court should leave the matter in the hands of those who best understand the problems and solutions until the issue is properly raised. The Court ought not follow the procedure of holding the act unconstitutional at some future date if no legislative or administrative action is taken, because this potentially junks a workable solution to a problem of importance to the entire population and dictates to the Legislature in a manner neither seemly nor called for.

Justice Coleman, concurring in part and dissenting in part, signed the opinion of Justice Ryan and concurred with Justice Fitzgerald, but she wrote separately to express her concern over the Court's *sua sponte* expression of constitutional doctrine of the due process insufficiency of insurance regulation without benefit of facts, briefs, oral arguments, or prior consideration by any lower court and without knowledge of the plaintiffs or defendants. The opinion of the Court transforms the management of a private industry into a *state* function subject to such due process regulation as has been reserved for state agencies with an analysis which is based on a factual vacuum and highly questionable premises. The conclusion that, because the state requires the public to purchase a certain product from a private business as a prerequisite to engaging in a certain private activity, the action of that business is thus state action, dangerously blurs the necessary and important distinction between private enterprise and public government. The unsolicited opinion of the Court lays the groundwork for government regulation of private industry such as the people have never countenanced under the Constitution. The Court lacks the experience and expertise, or the means peculiar to the Legislature of acquiring it, to assess the financial impact of creating a right in *every* dissatisfied motorist to administrative review of the decisions of an insurer. The requirements in part III of the majority opinion are not necessary under any present concept of constitutional law, nor are they necessary to accom-

plish the ends of fairness. Changes in the no-fault insurance act are likely to take place where they should, in the Legislature, based on studies made and hearings held by the Legislature and the Governor to determine what changes are indicated after the first five years of experience with the act. The Court should not *sua sponte* usurp their functions.

65 Mich App 355; 237 NW2d 325 (1975) affirmed in part, reversed in part.

### OPINION OF THE COURT

1. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—
   EQUAL PROTECTION—POLICE POWER.

   The no-fault insurance act, insofar as it provides benefits to victims of motor vehicle accidents without regard to "fault" as a substitute for tort remedies which are, in part, abolished, constitutionally accomplishes its goal; the act does not exceed the traditional scope of the Legislature's police power (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

2. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—PERSONAL INJURY
   PROTECTION—DUE PROCESS—EQUAL PROTECTION.

   The personal injury protection scheme of the no-fault insurance act, with its comprehensive and expeditious benefit system, is reasonably related to the legislative objective of correcting deficiencies in the tort system as shown by evidence in an action challenging the constitutionality of the act that under the former system the doctrine of contributory negligence denied benefits to a high percentage of motor vehicle accident victims, minor injuries were overcompensated, long payment delays were commonplace, the court system was overburdened, and persons with low income and little education suffered discrimination (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

3. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—PROPERTY DAMAGE
   —DUE PROCESS—EQUAL PROTECTION.

   The property damage protection scheme of the no-fault insurance act is reasonably related to the valid public purposes of calculating rates on the basis of repair costs of the insured vehicle rather than on the potential damage to a vehicle of unknown value, creating an incentive to build safer motor vehicles, encouraging group insurance rates, and reducing insurance costs by eliminating the necessity of investigating accidents to determine "fault" liability (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

4. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—COMPULSORY INSUR-
ANCE—RATEMAKING—DUE PROCESS.

The mechanisms of the no-fault automobile insurance act and the
Insurance Code to protect the welfare of Michigan motorists
required by law to purchase no-fault insurance fail to provide
due process of law because (1) the statutory requirement that
insurance rates cannot be "excessive, inadequate or unfairly
discriminatory" has not been clarified by administrative rules
made by the Insurance Commissioner, interpretation by the
courts, or statutory definitions; (2) there are no provisions for
motorist participation in ratemaking or adequate provisions
permitting review of a motorist's rate; and (3) there is no
provision permitting challenge of a refusal of insurance, cancel-
lation, or assignment to the Automobile Placement Facility
which presumptively has higher rates than other automobile
insurers (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA
294; MCL 500.2403[1][d]; MSA 24.12403[1][d]).

5. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—RATEMAKING—DUE
PROCESS.

The no-fault automobile insurance act will remain in effect for 18
months from the date of the opinion which found the act
deficient in providing due process; at the end of this period the
Supreme Court will re-examine the act to determine whether
the Legislature and the Insurance Commissioner have reme-
died the constitutional deficiencies and will enter an appropri-
ate order (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA
294).

6. PARTIES—STANDING—TAXPAYER SUIT—STATUTES—CONSTITUTIONAL
LAW.

The statute and court rule regulating "taxpayer suits" do not
permit a group of plaintiffs to challenge the constitutionality of
any legislation merely because of an incidental expenditure of
state funds (MCL 600.2041; MSA 27A.2041; GCR 1963, 201.2[3]).

7. PARTIES—STANDING—TAXPAYER SUIT—NO-FAULT INSURANCE—CON-
STITUTIONAL LAW.

Plaintiffs do not have standing, as taxpayers, to challenge the
constitutionality of the no-fault insurance act, which does not,
on its face, contemplate the expenditure of state funds where
the only expenditure of state funds alleged is incidental to
implementing the act (1972 PA 294; MCL 600.2041; MSA
27A.2041; GCR 1963, 201.2[3]).

8. Declaratory Judgment—Actual Controversy—Words and
      Phrases.

    An "actual controversy", which is a condition precedent to invo-
cation of declaratory relief under the general court rules, exists
where a declaratory judgment is necessary to guide the plain-
tiff's future conduct in order to preserve his legal rights (GCR
1963, 521.1).

9. Declaratory Judgment—Actual Controversy—Adverse Inter-
      est.

    A court is not precluded by the "actual controversy" requirement
of the court rule governing declaratory judgments from reach-
ing issues before injuries or losses have occurred; however, the
plaintiff must, at a minimum, allege and prove facts which
show an adverse enough interest to show an actual, justiciable
controversy (GCR 1963, 521.1).

10. Parties—Standing—Declaratory Judgment—No-Fault Insur-
      ance.

    Automobile and motorcycle owners, including a retiree who cares
for his disabled wife, and automobile insurance companies have
standing to seek a declaratory judgment on the constitutional-
ity of the compulsory provisions of the no-fault insurance act,
the personal injury protection scheme, the property damage
protection scheme, the exclusion of two-wheel motor vehicles
from the act, the scheme for work-loss and replacement-services
reimbursement, and provisions governing nonresident motorists
(1972 PA 294; GCR 1963, 521.1).

11. Constitutional Law—No-Fault Insurance—Compulsory In-
      surance—Due Process—Equal Protection—Police Power.

    The compulsory insurance requirement of the no-fault automobile
insurance act does not exceed the traditional scope of the police
power; the insurance required under the act insures not only
the driver of a motor vehicle, but also passengers, pedestrians,
and owners of fixed property; furthermore, the operation of a
motor vehicle, even when it affects no one but the driver,
presents pervasive and commonly recognized dangers which
result in serious and immediate danger to a large section of
society (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA
294).

12. Constitutional Law—No-Fault Insurance—Due Process—
      State Action.

    A sufficiently close nexus exists between the state and the action
of insurance companies in establishing rate structures under

the no-fault automobile insurance act so that the action may fairly be treated as that of the state itself under the Due Process Clause where failure to comply with the compulsory no-fault automobile insurance provisions may result in criminal and civil sanctions, the act specifies the extent of coverage to be provided and the conditions of payment of benefits, and the no-fault act and the Insurance Code provide for the assignment of claims and risks; this is not merely a grant of a monopoly to a utility, but makes the insurance companies, in effect, the instruments by which the Legislature carries out a scheme of general welfare (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).

13. CONSTITUTIONAL LAW—DUE PROCESS—PROTECTED INTERESTS—WORDS AND PHRASES.

The existence of interests or benefits entitled to due process protection depends on the extent to which government activity has fostered dependence of citizens on that activity in their daily lives; the concepts of "liberty" and "property" protected by due process are not to be defined in a narrow or technical sense but are to be given broad application (US Const, Am XIV; Const 1963, art 1, § 17).

14. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—RATEMAKING—DUE PROCESS.

The availability of compulsory no-fault insurance and the statutory scheme for regulating no-fault insurance rates are subject to due process scrutiny because the ability to register and operate a motor vehicle is, in essence, as significant an interest as the interest in keeping a driver's license once it has been issued, the no-fault act provides that compulsory coverage will be available through the Automobile Placement Facility to any person who is "unable to procure it through ordinary methods", and the Insurance Code declares that insurance rates should not be "excessive, inadequate or unfairly discriminatory" (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294; MCL 500.2403[1][d]; MSA 24.12403[1][d]).

15. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—RATEMAKING—DUE PROCESS.

Due process in the ratemaking procedure for compulsory no-fault insurance requires, at a minimum, (1) that a statutory amendment or an administrative rule by the Insurance Commissioner give substantial meaning to the statutory requirement that rates shall not be "excessive, inadequate or unfairly discriminatory"; (2) that a rate must provide premiums reasonable to

insured and insurer for the specific insurance coverage, the factors which properly may be considered by the insurer in differentiating premiums among those insured, and the amount of differential appropriate for each factor; (3) that such information for each insurer must be publicized so that every person affected can readily ascertain the factors and amounts of differentials applicable to him and calculate the premium the insurer may charge; and (4) that prompt and effective administrative review be available to every motorist of calculation of the factors, differential and premium applicable to him and of the basis for the refusal or cancellation of insurance (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).

16. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—EQUAL PROTECTION.

The test to determine whether the Legislature constitutionally exercised its police power in accord with due process and equal protection in enacting a particular scheme under the no-fault insurance act is whether any state of facts, either known or which could reasonably be assumed, supports the legislative judgment under the police power as rationally related to a legitimate government interest (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

17. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—EQUAL PROTECTION—QUESTION OF FACT.

The complexity of problems inherent in a judicial determination whether the police power legislative judgments in enacting the no-fault insurance act comply with due process and equal protection requires a trial rather than purely legal arguments or facts which may be judicially noticed because the determination is predicated upon complicated statistics and actuarial facts (which have substantial economic consequences) of the motor vehicle insurance "trade" or business (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

18. CONSTITUTIONAL LAW—TORTS—ABOLITION OF REMEDY—DUE PROCESS.

The Legislature need not provide an adequate substitute remedy before abolishing a common-law cause of action in tort; the constitutionality of a statutory abolition of a common-law remedy is measured by the traditional due process test, whether the legislation bears a reasonable relation to a permissible legislative objective (US Const, Am XIV; Const 1963, art 1, § 17; Const 1963, art 3, § 7).

19. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—TORTS—ABOLITION
   OF REMEDY—EQUAL PROTECTION.

   The no-fault insurance act does not violate equal protection by
   creating incidental statutory classifications in partially abolish-
   ing the common-law remedy in tort for persons injured by
   motor vehicle tortfeasors where evidence shows that motor
   vehicle accidents have consistently been the principal cause of
   accidental death in the state; the classification between the
   victims of insured and uninsured motor vehicle tortfeasors
   serves as one of the incentives for compliance with the compul-
   sory provisions of the act because an uninsured motorist may
   be liable in tort for all injury suffered by the victim and
   uninsured victims of uninsured motorists may still obtain
   personal injury benefits under the Assigned Claims Facility (US
   Const, Am XIV; Const 1963, art 1, § 2; 1972 PA 294).

20. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—PROPERTY DAMAGE
   —DUE PROCESS.

   The Legislature is free to experiment with ways to improve the
   tort system of compensation for property damage by negligent
   motorists even though the former tort system is not shown to
   be inadequate; the fact that anticipated effects of lower and
   more equitable premiums have not yet been achieved at an
   early stage of the operation of the no-fault insurance act does
   not diminish the legitimacy of the goals of improving the tort
   system of recovery or the reasonableness of the means adopted
   (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).

21. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—PROPERTY DAMAGE
   —FIRST-PARTY RECOVERY—EQUAL PROTECTION.

   Equal protection does not require that every aspect of the no-
   fault insurance scheme provide first-party protection *i.e.,* recov-
   ery by the victim from his own insurer; in accidents involving
   motor vehicles and tangible non-moving property the motor
   vehicle is usually at fault, and the no-fault insurance act
   properly makes the motorist liable for the damage he does to
   such property without making a determination of fault in each
   case (US Const, Am XIV; Const 1963, art 1, § 2; 1972 PA 294).

22. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—PROPERTY DAMAGE
   —LIMITATION OF DAMAGES—EQUAL PROTECTION.

   The provision of the no-fault insurance act that property damage
   compensation benefits paid under one policy for all damage to
   tangible property resulting from an accident shall not exceed
   $1,000,000 does not violate equal protection where it appears
   from the record at trial that the Legislature sought to limit the

absolute liability of insurance companies and that the limit chosen was justified from an actuarial standpoint (US Const, Am XIV; Const 1963, art 1, § 2; 1972 PA 294).

23. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—MOTORCYCLES—
EQUAL PROTECTION.

Exclusion of two-wheel vehicles (motorcyles) from coverage under the no-fault insurance act does not violate equal protection where evidence produced at trial established that motorcyles are rarely at fault in accidents, motorcyle drivers and passengers are killed or severely injured in accidents at a rate twice those in an automobile, and inclusion of motorcyles in a no-fault system would result in insurance premiums so high as to preclude most motorcyclists from purchasing insurance (US Const, Am XIV; Const 1963, art 1, § 2; 1972 PA 294).

24. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—WORK LOSS—RE-
PLACEMENT SERVICES—REIMBURSEMENT—DUE PROCESS—QUES-
TION OF FACT.

The disposition of constitutional challenges to the scheme for reimbursement of work loss and replacement services in the home and to the nonresident motorist scheme of the no-fault insurance act must be made on an adequate factual record developed at trial in accordance with traditional due process and equal protection tests rather than upon inadequate stipulations of fact or upon a finding of the trial court that no evidence was offered (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

DISSENTING OPINION BY RYAN, J.

COLEMAN, J.

25. PARTIES—DECLARATORY JUDGMENT—STANDING—ACTUAL CONTRO-
VERSY—WORDS AND PHRASES.

*Plaintiffs must allege and prove an actual controversy before a court can grant declaratory relief; "actual controversy" means something more than the plaintiffs' need to know in order to guide their future conduct; in addition, "actual controversy" connotes the pursuance of an honest and actual antagonistic assertion of rights by one party against another (GCR 1963, 521.1).*

26. PARTIES—NO-FAULT INSURANCE—DECLARATORY JUDGMENT—
STANDING—CONSTITUTIONAL LAW.

*Michigan residents who own and operate automobiles and who*

*are compelled under the threat of civil and criminal sanctions to purchase no-fault automobile insurance, some of whom are allegedly financially unable to buy the compulsory coverage, have standing to challenge the scheme of the no-fault insurance act in a suit for declaratory judgment because they are in a position adverse to the defendant state officials whose duty it is to implement the compulsory coverage provisions (1972 PA 294; GCR 1963, 521.1).*

27. COURTS—APPEAL AND ERROR—CONSTITUTIONAL LAW—QUESTIONS DECIDED.

*A party wishing to make a claim of unconstitutionality of a statute must raise it on appeal; an appellate court of final and discretionary review does not properly conjure up issues of "interest" or even "great importance" which the litigants have not raised or asked the court to decide.*

28. AUTOMOBILES—HIGHWAYS—STATUTES—POLICE POWER—LIABILITY.

*The police power of the Legislature to control the operation of motor vehicles upon state highways includes the power to enact legislation affecting the reciprocal rights and duties of all motor vehicle owners, operators, or occupants when those rights and duties arise out of such operation.*

29. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—POLICE POWER—AUTOMOBILES.

*The legislative decision to accomplish the legitimate goal of mitigating the detrimental consequences of highway motor vehicle accidents through the enactment of legislation designed to insure a party's financial responsibility to others as well as to himself by requiring the purchase of no-fault automobile insurance is clearly within the state's police power and also is an integral part of its authority and interest in licensing motor vehicle operators and registering motor vehicles (1972 PA 294).*

30. CONSTITUTIONAL LAW—STATUTES—DUE PROCESS—EQUAL PROTECTION.

*The Legislature is vested with wide discretion not only to determine what is inimical to the public welfare, but also to determine what is fairly designed to protect the public against evils which might otherwise occur; the expediency, the wisdom, or the desirability of the means adopted by the Legislature to advance legitimate public interests is strictly within the discretion of the Legislature, providing the means chosen do not offend constitutional safeguards (US Const, Am XIV; Const 1963, art 1, §§ 2, 17).*

31. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—COMPULSORY INSURANCE—DUE PROCESS—EQUAL PROTECTION.

*The imposition of a compulsory no-fault insurance requirement upon all owners or registrants of motor vehicles required to be registered in this state may be something of a burden upon certain persons under certain conditions, but this is not, per se, unconstitutional; to achieve the goal of mitigating the detrimental consequences of motor vehicle accidents by insuring a party's financial responsibility the Legislature may condition the operation of a motor vehicle upon the procurement of no-fault personal injury and property damage protection insurance (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).*

32. CONSTITUTIONAL LAW—DUE PROCESS—PROCEDURAL PROTECTION—PROPERTY.

*The due process procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits; when the benefits are terminated, the constitutional right to a hearing provides an opportunity for a person to vindicate his claim to such benefits, but procedural due process is not required until a benefit is abridged or otherwise threatened (US Const, Am XIV; Const 1963, art 1, § 17).*

33. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—PROPERTY INTEREST.

*An individual does not possess, in the abstract, a property interest in the operation of his vehicle upon state highways; the requirement of no-fault insurance conditions or defines one aspect of the eligibility requirement for the benefit of registering a vehicle, for which a person does not have a valid claim of entitlement until the requirement is fulfilled (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).*

34. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—COMPULSORY INSURANCE—DUE PROCESS.

*The statutory condition of obtaining no-fault insurance to register a motor vehicle is no more than a partial determinant of the dimensions of the statutory property interest in registering a motor vehicle; so long as the statutory condition is not palpably arbitrary or unreasonable, it does not offend due process (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).*

35. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—MOVING VEHICLES—PROPERTY DAMAGE—DUE PROCESS—EQUAL PROTECTION.

*The compulsory third-party property damage coverage payable*

*without regard to fault for damage inflicted to tangible property, except moving motor vehicles, creates a statutory classification which is rationally related to the valid legislative objectives of fixing financial responsibility for damage to tangible property inflicted by motor vehicles, shifting insurance premiums to more closely reflect the value of the car one drives while affording a premium saving to one who does not purchase optional first-party vehicle coverage, possibly making group insurance feasible, and creating incentives for buying more crashworthy vehicles (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).*

36. CONSTITUTIONAL LAW—STATUTORY CLASSIFICATION—EQUAL PROTECTION.

*The Legislature may be justified in treating two classes of persons differently where there is a natural difference between the situation or circumstances of the classes; the state enjoys a wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary (US Const, Am XIV; Const 1963, art 1, § 2).*

37. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—WORK LOSS BENEFITS—EXPENSES FOR REPLACEMENT SERVICES—EQUAL PROTECTION.

*The different treatment under the no-fault insurance act of work loss benefits and reimbursement for replacement services in the home does not offend the constitutional guarantees of equal protection because the lost wages may be determined on the basis of a person's prior wage scale, but the ordinary and necessary services performed in the home are not subject to valuation under the same criterion because one cannot ordinarily incur the cost of a substitute to perform the job of the accident victim; the fact that the services in the home must be incurred before reimbursement also serves a prophylactic function which has not been shown to be unreasonable, and the different maximum limits imposed appear reasonably related to their reimbursement functions (US Const, Am XIV; Const 1963, art 1, § 2; 1972 PA 294).*

38. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—NONRESIDENT MOTORISTS—DUE PROCESS—EQUAL PROTECTION.

*The Legislature, in view of the extent of its authority over out-of-state motor vehicles, reasonably excluded from the mandatory coverage scheme of the no-fault insurance act out-of-state motor vehicles which are not operated for an aggregate of more than 30 days in any calendar year; those non-residents who do not*

voluntarily procure the no-fault coverage quite reasonably do not receive the concomitant no-fault benefits (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

39. CONSTITUTIONAL LAW—APPEAL AND ERROR.

The proper discharge of the judicial function, when evaluating new legislation for constitutional validity, is very narrow: it is to determine whether there is any rational relationship between the goals sought to be accomplished and the means chosen.

40. CONSTITUTIONAL LAW—STATUTES—SEPARATION OF POWERS.

The Court's review and judgment on the constitutionality of statutes must not unduly hamper the Legislature's freedom to experiment and innovate by superimposing the Court's judgment as to the expediency or wisdom of the legislation over the Legislature's judgment.

DISSENTING OPINION BY FITZGERALD, J.

41. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—EQUAL PROTECTION.

The no-fault insurance act, at the time it was considered by the Court under the traditional due process and equal protection standards, is a reasonable legislative method for assuring that victims of automobile accidents are promptly and adequately compensated (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

42. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS.

Whether Michigan motorists are entitled to certain procedural due process protection in the availability of and ratemaking for no-fault automobile insurance should not be decided in a case where a factual record has not been made on the question and no plaintiff has claimed an entitlement to or a denial of due process; due process does not exist in a vacuum and an adversary presentation is necessary to decide the issues (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).

DISSENTING OPINION BY COLEMAN, J.

43. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—COURTS—RAISING ISSUES Sua Sponte—PARTIES.

The Supreme Court should not, in an action for declaratory judgment which challenges the constitutionality of the no-fault

*insurance act*, sua sponte *raise the issue of the constitutionality of the ratemaking and availability of compulsory no-fault automobile insurance and use it as a vehicle to affect the entire system of civil justice and freedom of the marketplace without any facts on the record, briefs, arguments of counsel, or lower court consideration, or knowledge of the parties (1972 PA 294).*

44. CONSTITUTIONAL LAW—NO-FAULT INSURANCE—DUE PROCESS—
STATE ACTION—RATES—AVAILABILITY.

*The statutory requirement that automobile registrants obtain compulsory no-fault automobile insurance does not transform the insurance rate-making process from an essentially private series of actions with some governmental supervision to that state action which is subject to due process controls including a right for every motorist to obtain administrative review of actions of an insurer (US Const, Am XIV; Const 1963, art 1, § 17; 1972 PA 294).*

*Lopatin, Miller, Bindes, Freedman & Bluestone* (by *Sheldon L. Miller* and *Victoria C. Heldman*) and *Philo, Cockrel, Spearman, Cooper, Rine, King & Atkinson* for plaintiffs.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *Harry G. Iwasko, Jr.*, Assistant Attorney General, for defendants Secretary of State, and Commissioner of Insurance.

*Bodman, Longley, Bogle & Dahling* (by *Theodore Souris* and *James R. Buschmann*) for defendant State Farm Mutual Automobile Insurance Company.

*Dickinson, Wright, McKean, Cudlip & Moon* (by *W. Gerald Warren, Dawn L. Phillips, Richard J. Meyers,* and *Robert L. Schwartz*) for defendant Allstate Insurance Company.

*Downs & Edwards* for defendant League General Insurance Company.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *James D. Tracy, Michael J. McGuigan,* and *Nancy C. Kurtz)* for defendants Detroit Automobile Inter-Insurance Exchange and Riverside Insurance Company of America.

*Honigman, Miller, Schwartz & Cohn (Avern Cohn* and *John M. Kamins,* of counsel) for defendants Aetna Casualty and Surety Company, The Travelers Indemnity Company, Hartford Accident and Indemnity Company, Continental Casualty Company, and the Home Indemnity Company.

Amici Curiae:

*Robert E. Keeton.*

American Mutual Insurance Alliance, by *Foster, Swift & Collins, P.C.* (by *Webb A. Smith, David W. McKeague,* and *Michael J. Schmedlen).*

Michigan Mutual Insurance Company, by *Elijah Poxson* and *James L. Schueler.*

Progressive Casualty Company, Universal Underwriters, Midwest Mutual Insurance Company, Balboa Insurance Company, Northland Insurance Company, Reserve Insurance Company, and National Indemnity Insurance Company, by *Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen* (by *D. J. Watters* and *Charles A. Huckabay).*

WILLIAMS, J. The Michigan No-Fault Insurance Act, which became law on October 1, 1973, was offered as an innovative social and legal response to the long payment delays, inequitable payment structure, and high legal costs inherent in the tort (or "fault") liability system. The goal of the no-

fault insurance system was to provide victims of
motor vehicle accidents assured, adequate, and
prompt reparation for certain economic losses. The
Legislature believed this goal could be most effec-
tively achieved through a system of *compulsory*
insurance, whereby every Michigan motorist
would be required to purchase no-fault insurance
or be unable to operate a motor vehicle legally in
this state. Under this system, victims of motor
vehicle accidents would receive insurance benefits
for their injuries as a substitute for their common-
law remedy in tort.

*The No-Fault Act, insofar as it provides benefits
to victims of motor vehicle accidents without re-
gard to "fault" (as a substitution for tort remedies
which are, in part, abolished), constitutionally ac-
complishes its goal.* After intense scrutiny of this
litigation's extensive record, this Court holds that
the No-Fault Act does not exceed the traditional
scope of the Legislature's police power. The partial
abolition of tort remedies under the act is consist-
ent with constitutional principles articulated by
this Court. The act's personal injury protection
insurance scheme, with its comprehensive and
expeditious benefit system, reasonably relates to
the evidence advanced at trial that under the tort
liability system the doctrine of contributory negli-
gence denied benefits to a high percentage of
motor vehicle accident victims, minor injuries
were overcompensated, serious injuries were un-
dercompensated, long payment delays were com-
monplace, the court system was overburdened, and
those with low income and little education suffered
discrimination. See Part V, *infra.* Likewise, the
act's property damage protection scheme reason-
ably relates to the valid public purposes of creat-
ing an incentive to build safer motor vehicles,
encouraging group rates, and reducing costs by

eliminating the necessity of accident "fault" investigation. See Part VI, *infra.*

However, while the No-Fault Act is, in theory, a valid, rational response to problems affecting the general welfare, *the actual mechanisms for protecting the welfare of individual Michigan motorists, required by law to purchase no-fault insurance, are constitutionally deficient in failing to provide due process.* The Legislature, in the No-Fault Act and other sections of the Insurance Code, recognized the significance of a motorist's interest in the registration and operation of a motor vehicle on Michigan streets and highways. Measures were taken to assure that compulsory no-fault insurance in Michigan would be available to motorists at fair and equitable rates. These measures are, unfortunately, inadequate to protect individual motorists, who must purchase no-fault insurance from private insurers, from potentially unfair insurance rates, insurance refusal or cancellation. In particular, under the No-Fault Act and the Insurance Code:

1. The statutory protection against "excessive, inadequate or unfairly discriminatory" rates is without the support of clarifying rules established by the Commissioner of Insurance, without legislatively sufficient definition, and without any history of prior court interpretation; the legislative mandate is thus reduced to mere exhortation (see Part III-B[1] *infra);*

2. There are inadequate statutory provisions for a motorist attacking the validity of an individual rating decision (see Part III-B[1] *infra);*

3. There is no adequate statutory provision permitting an individual to challenge insurance refusal, discriminatory cancellation, or assignment to the "Automobile Placement Facility" with its presumptively higher rates (see Part III-B[2] *infra).*

The constitutional status of the No-Fault Act places this Court in an extraordinary jurisprudential position: the No-Fault Act, which has substantially affected every Michigan motorist, every insurance company underwriting motor vehicle insurance in Michigan, and our entire system of civil justice for nearly five years, is constitutional in its general thrust but unconstitutionally deficient in its mechanisms for assuring that compulsory no-fault insurance is available to Michigan motorists at fair and equitable rates.

*We therefore believe it necessary, for purposes of the general jurisprudence, the general welfare of the public and the administration of justice, to hold that the No-Fault Act will remain in effect for 18 months from the issuance of this opinion.*

During this period, the Legislature and the Commissioner of Insurance can remedy the act's deficiencies by taking necessary constitutional corrective action assuring that compulsory no-fault insurance is available at fair and equitable rates. The types of corrective actions necessary to remedy the act's due process deficiencies are set out in Part III-C of our opinion.

Toward the end of this period, this Court will reexamine the status of the No-Fault Act to determine whether the present constitutional deficiencies have been remedied. At that time, an appropriate order reflecting the act's constitutional status will be entered by this Court.

I.

Prior to October 1, 1973, the effective date of the No-Fault Act, 11 named plaintiffs in their own behalf and as representatives of several classes of other persons initiated this action against the

Secretary of State, the Commissioner of Insurance, and 25 named automobile insurers as representatives of the entire automobile insurance industry in Michigan. The complaint sought a declaratory judgment as to the constitutionality of the No-Fault Act and an injunction against the act's enforcement.[1] Plaintiffs initially had sought a temporary injunction against enforcement of the act. This relief had been denied.

An amended complaint was then filed, pursuant to an order of the trial court, on December 6, 1973, adding Michigan's Attorney General as a defendant. Additionally, the following amendments were made: one named plaintiff was dropped and eight others were added as named plaintiffs; and the assertion of rights to declaratory and injunctive relief were added on behalf of five of the named plaintiffs as property taxpayers, pursuant to GCR 1963, 201.2(3). Two of the defendant insurers, Allstate Insurance Company and State Farm Mutual Automobile Insurance Company, filed cross-complaints, challenging the constitutionality of the act's property damage protection insurance scheme, §§ 3121, 3123, 3125 and 3127.

Pursuant to GCR 1963, 301.6, Judge Horace W. Gilmore was assigned to conduct all matters preliminary to trial and to try the case. Preliminary and final pretrial conferences were conducted on four days during November and December 1973. At these conferences the parties identified legal and factual issues to be tried and stipulated to facts which were undisputed. The pretrial statement issued at the conclusion of the conferences was subsequently amended on several occasions before trial to include additional issues.

---

[1] This action was brought subsequent to the issuance of this Court's *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973).

Judge Gilmore ably and commendably conducted the trial, which occupied 35 trial days, from January 14 to March 21, 1974. The parties were given every opportunity for argument; the trial record includes over 5,000 pages of transcript and over 200 exhibits.

On May 20, 1974 Judge Gilmore filed a learned and thoughtful opinion of over 100 pages. The court held that plaintiffs had standing to raise every constitutional objection they asserted pursuant to the "taxpayers' suit" rule, and statute (GCR 1963, 201.2[3]; MCL 600.2041; MSA 27A.2041), and the declaratory judgment rule (GCR 1963, 521.1). The court also held that the No-Fault Act did not significantly infringe or penalize plaintiffs' constitutional "right to travel". The court held constitutional:

§ 3101(1), which requires the purchase of no-fault insurance as a condition precedent to registration and operation of a motor vehicle;

the penalties imposed for non-compliance with the act's compulsory insurance requirement (§ 3102[2]);

the act's personal injury protection insurance scheme;

the limitation of $1,000 for no-fault funeral and burial expenses (§ 3107);

the classification between workers in the home and workers outside the home in terms of maximum benefits payable in case of injury (§ 3107);

the delegation of authority to the Commissioner of Insurance to approve deductibles as provided in § 3109a of the act;

§ 3102(1), which requires that nonresident motorists maintain no-fault insurance when in Michigan for an aggregate of more than 30 days in any calendar year;

§ 3116 which, read in light of § 3135, can be interpreted to mean that an insurer paying personal injury insurance benefits is entitled to reimbursement from the tort recovery of an injured person to the extent that the tort recovery includes damages for losses for which personal injury insurance benefits were paid;

§ 3114, which requires that a person who suffers accidental bodily injury while an operator or passenger of a motor vehicle engaged in the business of transporting passengers seek personal injury insurance benefits from the insurer of the vehicle.

The court held unconstitutional:

the act's property damage protection insurance scheme;

§ 3101(2), which excludes two-wheel vehicles from coverage under the act;

§ 3107(b), which requires that the cost of replacement for ordinary and necessary services be "reasonably incurred" before reimbursement;

§ 3109(1), which requires that benefits provided or required to be provided under the laws of any state or the federal government be subtracted from personal injury insurance benefits;

the delegation of authority to the Commissioner of Insurance to approve deductibles as provided in § 3109(3) of the act;

§ 3113, which denies injured "transient" nonresident motorists who have not purchased no-fault insurance or whose insurer has not filed a certificate in compliance with § 3163 personal injury insurance benefits and tort recovery below the threshold of § 3135(2).

The court also held that the sections of the act declared unconstitutional were severable.

On June 25, 1974, the trial court issued its declaratory judgment. Upon entry of this judgment, plaintiffs moved for a new trial. After a hearing, this motion was denied by the court.

Plaintiffs and various defendants appealed to the Court of Appeals.

Application for leave to appeal to this Court prior to decision by the Court of Appeals was filed on August 21, 1974, by all defendants and was denied by this Court December 23, 1974.

Thereafter, upon review of the record and the

hearing of arguments, the Court of Appeals issued its opinion November 5, 1975.[2]

The Court of Appeals disagreed with the trial court that the "taxpayers' suit" rule and statute, *supra,* were applicable to the instant case. 65 Mich App 355, 362; 237 NW2d 325 (1975). The Court then found plaintiffs had standing under the declaratory judgment rule, *supra,* to challenge a limited number of issues.[3]

---

[2] *Shavers v Attorney General,* 65 Mich App 355; 237 NW2d 325 (1975).

[3] The Court of Appeals in its opinion structured its "standing" analysis in terms of the trial court's declaratory judgment. The Court stated that plaintiffs, under the declaratory judgment rule, had not shown a required "case of actual controversy" with respect to "Paragraphs C, D, E, F, and H of the court's judgment". 65 Mich App 355, 363. In terms of the trial court's declaratory judgment, this meant that plaintiffs did not have standing to challenge:

—the constitutionality of § 3107(b)'s requirement that the cost of replacement for ordinary and necessary services be "reasonably incurred" before reimbursement (Paragraph C of the declaratory judgment);

—the constitutionality of the delegation of authority to the Commissioner of Insurance to approve deductibles as provided in § 3109(3) of the act (Paragraph D of the declaratory judgment);

—the constitutionality of § 3109(1)'s requirement that benefits provided or required to be provided under the laws of any state or the federal government be subtracted from personal insurance injury benefits (Paragraph E of the declaratory judgment);

—the constitutionality of § 3113(c) and § 3135(2) of the act as they pertain to "transient" non-resident motorists (Paragraph F of the declaratory judgment);

—the interpretation of § 3116 of the act, which pertains to the subtraction of tort recovery from personal injury insurance benefits (Paragraph H of the declaratory judgment);

the Court of Appeals held that plaintiffs' action for declaratory judgment on the issues found in Paragraphs A, B, and G of the trial court's judgment was appropriate. 65 Mich App 355, 363-364. Paragraph A of the trial court's declaratory judgment stated, in pertinent part, "the act, including § 3109a thereof, does not violate any provision of the United States and Michigan Constitutions except as hereinafter specifically declared". Paragraph B declared the exclusion of two-wheel vehicles from the act's coverage unconstitutional. Paragraph G declared the act's property protection insurance scheme unconstitutional. Although the Court of Appeals held that plaintiffs had standing to challenge all issues "found" in Paragraph A of the declaratory judgment, *i.e.,* all issues declared constitutional by the

The Court of Appeals held constitutional the act's personal injury protection scheme (affirming the trial court), 65 Mich App 355, 365-367, and the act's exclusion of two-wheel vehicles from compulsory no-fault coverage (overruling the trial court), 65 Mich App 355, 367-368. The Court held unconstitutional the act's property damage protection scheme (affirming the trial court), 65 Mich App 355, 368-370. The Court also held that the unconstitutional property damage protection scheme was severable. 65 Mich App 355, 372.

On November 25, 1975, plaintiffs filed a motion for rehearing with the Court of Appeals challenging the findings of the Court of Appeals in its opinion but, more specifically, requesting the Court of Appeals remand the case for further testimony consistent with GCR 1963, 820.1(5). Plaintiffs' motion for rehearing in the Court of Appeals was denied on December 17, 1975. On January 9, 1976, plaintiffs filed a motion for leave to appeal to this Court. Leave was granted on May 27, 1976.

## II.

A crucial threshold question concerns plaintiffs' standing to raise certain issues.

Plaintiffs first seek to establish standing to challenge the constitutionality of the No-Fault Act under the court rule and statute which creates a "taxpayers' suit". GCR 1963, 201.2(3) and MCL 600.2041; MSA 27A.2041, which are identical, deal with real parties in interest. The rule and statute provide in pertinent part:

trial court, the Court only addressed one of these issues, namely, the constitutionality of the act's personal injury protection insurance scheme. *The Court did not address the other issues found constitutional by the trial court although it stated plaintiffs had standing to raise them.*

"Every action shall be prosecuted in the name of the real party in interest * * * and further

\* \* \*

"3) An action to prevent the illegal expenditure of state funds or to test the constitutionality of a statute relating thereto may be brought * * * in the names of at least 5 residents of this state who own property assessed for direct taxation by the county wherein they reside."

The trial court held that plaintiffs had standing under the rule and statute to raise every constitutional objection they asserted. The Court of Appeals reversed, declaring:

"We disagree with the trial court's ruling that the court rule provides a basis for plaintiffs' suit. Plaintiffs are not concerned with the illegal expenditure of state funds. The court rule allows taxpayers aggrieved by the outlay of state funds to hurdle the traditional standing obstacle in taxpayers suits. We do not read it as permitting a group to challenge any legislation merely because of an incidental expenditure of state funds; almost all legislation involves some public spending. GCR 1963, 201.2(3) is inapplicable to this litigation." 65 Mich App 355, 362.

We agree. The No-Fault Act does not, on its face, contemplate the "expenditure of state funds". We do not believe that the "taxpayers' suit" rule and statute is intended to give plaintiffs standing to "test the constitutionality" of an entire act when the expenditure of funds alleged is incidental to its implementation. Compare *Hertel v Racing Commissioner*, 68 Mich App 191; 242 NW2d

526 (1976); *Jones v Racing Commissioner,* 56 Mich
App 65; 223 NW2d 367 (1974).[4]

Alternatively, both plaintiffs and cross-plaintiffs
seek to establish standing under the GCR 1963,
521.1 declaratory judgment rule. GCR 1963, 521.1
provides:

"In a case of actual controversy within its jurisdic-
tion, any circuit court of this state may declare the
rights and other legal relations of any interested party
seeking a declaratory judgment, whether or not relief is
or could be sought or granted."

The declaratory judgment rule was intended and
has been liberally construed to provide a broad,
flexible remedy with a view to making the courts
more accessible to the people. 2 Honigman &
Hawkins, Michigan Court Rules Annotated (2d ed),
Committee Comment, p 683; *Comm'r of Revenue v
Grand Trunk W R Co,* 326 Mich 371, 375; 40
NW2d 188 (1949).

The existence of an "actual controversy" is a
condition precedent to invocation of declaratory
relief. In general, "actual controversy" exists
where a declaratory judgment or decree is neces-
sary to guide a plaintiff's future conduct in order
to preserve his legal rights. *Updegraff v Attorney
General,* 298 Mich 48, 52; 298 NW 400 (1941);

---

[4] We do not believe that the cases relied on by the trial court in
reaching its holding are persuasive. In *Bode v Barrett,* 412 Ill 204,
206; 106 NE2d 521, 523 (1952), plaintiffs challenged statutes which
expressly controlled the raising and expenditure of state funds. *Blair
v Pitchess,* 5 Cal 3d 258; 96 Cal Rptr 42; 486 P2d 1242 (1971), involved
an attack on a statute which, though not contemplating the expendi-
ture of state funds, did directly and immediately involve county
officials. However, we reject this approach to taxpayers' suits because
it would, if adopted, virtually abolish the law of standing, a result not
clearly contemplated by GCR 1963, 201.2(3) and MCL 600.2041; MSA
27A.2041.

We also note that the Illinois and California "taxpayers' suit"
statutes do not include language similar to the Michigan statute's "to
test the constitutionality of a statute relating thereto".

*Flint v Consumers Power Co,* 290 Mich 305, 309-310; 287 NW 475 (1939); see, also, *Welfare Employees Union v Civil Service Comm,* 28 Mich App 343, 350-351; 184 NW2d 247 (1970).

This requirement of an "actual controversy" prevents a court from deciding hypothetical issues. However, a court is not precluded from reaching issues before actual injuries or losses have occurred. *Merkel v Long,* 368 Mich 1, 11-14; 117 NW2d 130 (1962). Also, before affirmative declaratory relief can be granted, it is essential that a plaintiff, at a minimum, pleads facts entitling him to the judgment he seeks and proves each fact alleged, *i.e.,* a plaintiff must allege and prove an actual *justiciable* controversy. See *Kuhn v East Detroit,* 50 Mich App 502; 213 NW2d 599 (1973).

Therefore, what is essential to an "actual controversy" under the declaratory judgment rule is that plaintiffs plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised.

The five plaintiffs who testified at trial all owned an automobile. Two had purchased no-fault insurance and three had not. One of the plaintiffs who had purchased no-fault insurance, Melvin Janasevich, testified that he was a retiree with no work income who cares for his paralyzed, wheelchair-confined wife. Plaintiffs' amended complaint names three persons who are "motorcycle owners and operators"; defendants' answer admits the status of these plaintiffs.[5] Also, it was undisputed

[5] The five plaintiffs who testified at trial were Eric Gentile, who owned an automobile but who had not purchased no-fault insurance; Melvin Janasevich, who owned an automobile and who had purchased no-fault insurance; John Shano, who owned an automobile, but who had not purchased no-fault insurance; Raymond Hullum, who owned an automobile and who had purchased no-fault insurance; Frederick Boyd, who owned an automobile and who had not purchased no-fault insurance.

on the record that the cross-plaintiff insurance companies who challenge the validity of the property damage provisions of the No-Fault Act were required to issue insurance policies in compliance with the act if they wished to continue to underwrite in Michigan.

This Court deeply appreciates that the No-Fault Act, in radically redefining the nature of Michigan's motor vehicle insurance, profoundly and importantly affects a crucial dimension of our lives. We are also aware that the constitutionality of this act has been in question since this action was commenced in August, 1973. In light of the record and our belief that plaintiffs, cross-plaintiffs, and the people of the State of Michigan deserve as definitive a decision on the challenges to the No-Fault Act as judiciously can be afforded within the parameters of the above stated rules for declaratory relief, we hold that plaintiffs and cross-plaintiffs have established standing under GCR 1963, 521.1 to raise the following issues:

1) whether § 3101, which requires registrants and operators of motor vehicles to maintain compulsory personal injury protection insurance, property protection damage insurance, and residual liability insurance, is constitutional;[6]

2) whether the act's personal injury protection insurance scheme violates the due process and

---

Plaintiff Janasevich testified that he was retired and that he has to take care of his paralyzed, wheelchair-confined wife.

The three plaintiffs named as "*motorcycle owners and operators*" in plaintiffs' amended complaint were Steven Makella, Linda Chamberlain and John Savard. For defendants' admission of this status in their answers, see Joint Appendix, pp 65a, 77a, 88a.

[6] Plaintiffs who have not purchased no-fault insurance would be exposed to criminal (see § 3102[2]) and civil (see § 3135[2]) penalties if the compulsory insurance requirement under the act is constitutional. If the compulsory insurance requirement under the act is unconstitutional, plaintiffs who have purchased no-fault insurance are entitled to a determination of this issue in order to guide their future conduct.

equal protection clauses of the Michigan and United States Constitutions[7] (Const 1963, art 1, §§ 2, 17; US Const, Am XIV);

3) whether the act's property damage protection insurance scheme violates the due process and equal protection clauses of the Michigan and United States Constitutions;[8]

4) whether § 3101(2), in excluding two-wheel motor vehicles from coverage under the act, violates the equal protection clauses of the Michigan and United States Constitutions;[9]

5) whether the act's statutory scheme with respect to work-loss reimbursement and reimbursement for replacement services, § 3107, violates the equal protection clauses of the Michigan and United States Constitutions;[10]

6) whether the act's statutory schemata with respect to nonresident, out-of-state motorists, § 3102(1), which requires nonresident motorists to maintain no-fault insurance when they are in Michigan "an aggregate of more than 30 days in any calendar year", and § 3113 read *inter alia* with § 3135(2), which pertains to transient nonresi-

---

[7] Plaintiffs who have purchased no-fault insurance would be exposed to tort liability without insurance reimbursement if the tort immunity vis-à-vis the personal injury protection insurance under the act is held unconstitutional.

[8] Cross-plaintiffs State Farm and Allstate, if they wish to underwrite property damage protection insurance in Michigan, must do so pursuant to §§ 3121, 3123, 3125, and 3127 of the act. Plaintiffs who have purchased no-fault insurance would be exposed to tort liability without insurance reimbursement if the tort immunity vis-à-vis the property damage protection insurance under the act is held unconstitutional.

[9] Plaintiff motorcycle owners and operators might be required to purchase no-fault insurance or be exposed to criminal (see § 3102[2]) and civil (see § 3135[2]) penalties if the two-wheel motor vehicle exclusion is held unconstitutional.

[10] Plaintiff Janasevich, who has purchased no-fault insurance and who is a retiree caring for a paralyzed, wheelchair-confined wife, might be exposed to discrimination under this statutory scheme if he were injured in a motor vehicle accident.

dent motorists, violate the due process and equal protection clauses of the Michigan and United States Constitutions.[11]

We do not reach two issues because they are not necessary to decision and appear to have been abandoned.[12] Also, we do not believe these plaintiffs have established standing under the declaratory judgment rule as to three issues.[13] Two of these issues are properly before this Court in *Workman v Detroit Automobile Inter-Insurance*

---

[11] Plaintiffs who have purchased no-fault insurance would be exposed to tort liability without insurance reimbursement if these schemata are held unconstitutional.

[12] These issues are (1) whether, under § 3114, it is constitutionally permissible to require a person suffering accidental bodily injury while an operator or passenger of a motor vehicle operated in the business of transporting passengers to seek personal protection insurance benefits from the insurer of the vehicle and (2) whether the $1,000 maximum limit for funeral and burial expenses under § 3107 is constitutional.

We note that we do not remand the issues not addressed by the Court of Appeals for which we have found standing (issues 1, 5, and 6, *supra*) because of the importance of the issues involved and the public's need for a prompt decision. GCR 1963, 852.1 and 865.1.

[13] Plaintiffs have not established standing to raise three issues, for the reasons stated: (1) Whether, under § 3116 of the act, tort claim recoveries must be subtracted from personal injury protection benefits. There is no proof on the record that any plaintiff had realized a tort claim which an insurer subtracted from the personal injury protection benefits which he received or to which he was entitled. (2) Whether, under § 3109(1) of the act, government benefits must be subtracted from personal injury protection benefits. There is no proof on the record that any plaintiff had a claim for an injury which had been denied or reduced on account of the fact he received government benefits. (3) Whether the Legislature, in conferring authority upon the Commissioner of Insurance to approve deductibles under § 3109(3) and § 3109a of the act (added by 1974 PA 72), constitutionally delegated its legislative power. There is no proof on the record that the Commissioner had approved any deductibles pursuant to these provisions. We note that the issue of whether § 3109(3) constitutes a valid delegation of legislative power has been properly before the Court of Appeals. See *Davidson v Johnson*, 76 Mich App 497; 257 NW2d 139 (1977); *Davidson v Johnson (On Rehearing)*, 79 Mich App 660; 262 NW2d 887 (1977); *Porter v Michigan Mutual Liability Co*, 80 Mich App 145; 263 NW2d 318 (1977).

*Exchange,* Docket No. 58106; and *O'Donnell v State Farm Mutual,* Docket No. 58833.

## III.

The first and most important issue before us, stated in its general terms, is whether § 3101(1) of the act, which requires registrants and operators of motor vehicles to maintain *compulsory* personal injury protection insurance, property damage insurance, and residual liability insurance, is constitutional.[14]

---

[14] The trial court held that "§ 3101(1), requiring the purchase of no-fault insurance, is constitutional".

Plaintiffs did not expressly appeal this issue to the Court of Appeals or to this Court. However, certain defendants admitted this issue was contested and addressed it in their briefs before this Court. See Briefs of Defendants-Appellees Allstate Insurance Company, pp 45-47; League General Insurance Company, pp 17, 35-36; Detroit Automobile Inter-Insurance Exchange and Riverside Insurance Company of America, pp 13-14; see, also, Brief of Amicus Curiae Progressive Casualty Company, *et al,* p 1.

A general concern with the impact of the No-Fault Act's compulsory insurance requirement has been a constant underlying issue throughout the litigation of this case. Plaintiffs have repeatedly voiced objection to the imposition of compulsory no-fault insurance without regard to its financial impact. See Plaintiffs' Complaint, and Plaintiffs' Second Amended Complaint. At trial, the trial court barred testimony concerning the application of the compulsory insurance requirement and its financial impact, perceiving the issue as solely one of law. However, at pretrial, the court recognized, and the parties agreed, " * * * that the issue of whether there are adequate guidelines to guide the Insurance Commissioner is clearly before the court and must be determined, especially in view of the fact that the statute now requires all motorists to carry insurance or to provide other security". The trial court did not address this "sub-issue" in its opinion. In their brief before the Court of Appeals, plaintiffs argued:

"When the Legislature refuses to establish adequate guidelines for rates, it actually encourages illegal rate discrimination. Discriminatory rates are the end result when no sufficient guidelines are established. Because the act does not furnish adequate guidelines to the Insurance Commissioner in setting rates, and the act does not establish adequate guidelines for the Secretary of State in approving security, the 'no fault' act must be unconstitutional. There cannot be a constitutional compulsory system without sufficient guidelines to establish, implement, and operate the legislative intent."

The Court of Appeals did not address this "sub-issue". Plaintiffs, in

We perceive the issue of the constitutionality of the "compulsory insurance requirement" of § 3101(1) to be, in essence, two-fold:

(A) Can the Legislature constitutionally, as a condition precedent to registration and operation of a motor vehicle, require the purchase of no-fault personal protection insurance and no-fault property protection insurance, or in the alternative require security approved by the Secretary of State?

(B) Does the present regulatory scheme for compulsory no-fault insurance sufficiently protect the interests of registrants and operators of motor

their brief before this Court, once again made reference to it. See Plaintiffs-Appellants Brief on Appeal, pp 2, 22 and Supplementary Brief on Appeal, pp 34-36.

Although plaintiffs did not expressly raise on appeal the issue decided by the trial court, "Can the Legislature constitutionally, as a condition precedent to [registration and] operation of a motor vehicle, require the purchase of no-fault personal protection insurance and no-fault property protection insurance * * * " we feel compelled to address it because of its basic, threshold importance to any decision we might render as to the No-Fault Act's constitutionality.

Plaintiffs forcefully challenged the due process sufficiency of the act's regulatory scheme before the trial court, in its brief before the Court of Appeals, and, by reference, before this Court (during oral argument plaintiffs requested that this Court "make reference to and use [their] Court of Appeals brief on any issues that were otherwise inadequate or deficient in this reviewing court"). As indicated *supra*, the trial court viewed this challenge as a "delegation" issue. The Court of Appeals did not even address plaintiffs' crucial challenge.

After five years of uncertainty as to the constitutionality of the No-Fault Act, we believe the people of the State of Michigan deserve an opinion which addresses this crucial constitutional challenge to the No-Fault Act's regulatory scheme head-on.

This challenge could be considered on the basis of whether the act's regulatory scheme contains sufficient protections to pass muster as a constitutional delegation by the Legislature. However, this opinion analyzes plaintiffs' due process challenge in two steps: first, does the requirement that Michigan motorists must purchase no-fault insurance in order to register and operate a motor vehicle create an entitlement to fairness and availability of such insurance; second, if there is such an entitlement, does the No-Fault Act on its face, or on its face complemented by proper agency rules and regulations, indicate that due process has been complied with in terms of plaintiff motorists' "entitled" interest. See discussion, Part III(B), *infra*.

vehicles in accord with the due process clause of the Michigan and United States Constitutions as to

(1) the fairness of insurance rates, and

(2) the proper availability of insurance.

## (A) *Compulsory No-Fault Insurance*

Before the advent of no-fault insurance, the power of the Legislature to require all motorists to obtain mandatory liability insurance as a prerequisite to receipt of a driving license was well-established.[15] The United States Supreme Court recently observed in *Bell v Burson,* 402 US 535, 539; 91 S Ct 1586; 29 L Ed 2d 90 (1971):

"If the statute barred the issuance of licenses to all motorists who did not carry liability insurance or who did not post security, the statute would not, under our cases, violate the Fourteenth Amendment. *Ex parte Poresky,* 290 US 30; 54 S Ct 3; 78 L Ed 152 (1933); *Continental Baking Co v Woodring,* 286 US 352; 52 S Ct 595; 76 L Ed 1155; 81 ALR 1402 (1932); *Hess v Pawloski,* 274 US 352; 47 S Ct 632; 71 L Ed 1091 (1927)."

The highest courts of eight states have reviewed their states' no-fault automobile insurance laws.[16]

---

[15] Michigan's No-Fault Act is generally recognized to be "compulsory", not "mandatory". The distinction is a semantic one made by those acquainted with insurance terms of art. Insurance is "mandatory" in nature when the buyer can choose whether or not to purchase insurance, but if he chooses to purchase insurance, he must purchase a specific type of insurance. Insurance is "compulsory" if the buyer must purchase a specific type of insurance, *i.e.,* the buyer has no choice in whether or not he purchases insurance.

[16] *Gentile v Altermatt,* 169 Conn 267; 363 A2d 1 (1975), *appeal dismissed* 423 US 1041 (1976); *Montgomery v Daniels,* 38 NY2d 41; 340 NE2d 444 (1975); *Singer v Shepperd,* 464 Pa 387; 346 A2d 897 (1975); *Lasky v State Farm Ins Co,* 296 So 2d 9 (Fla, 1974); *Manzanares v Bell,* 214 Kan 589; 522 P2d 1291 (1974); *Opinion of the Justices May 14, 1973,* 113 NH 205; 304 A2d 881 (1973); *Grace v Howlett,* 51 Ill 2d 478; 283 NE2d 474 (1972); and *Pinnick v Cleary,*

Every court which has considered the issue of whether a legislature, within its police power, can require no-fault insurance as a condition precedent to the operation of a motor vehicle, has answered in the affirmative.[17] This Court also holds that the Michigan Legislature has authority under its police power to compel the purchase of no-fault insurance.

The No-Fault Act's self-insurance concept is embraced within the traditional scope of the police power as stated in the maxim "sic utere tuo ut alienum non laedas" ("so use your own that you do not injure that of another"). 16 Am Jur 2d, Constitutional Law, § 267, p 523. The insurance required under the No-Fault Act protects not only the driver of a motor vehicle, but also passengers, pedestrians, owners of fixed property, and owners of properly parked vehicles. Furthermore, the operation of a motor vehicle, even when it affects no one but the driver,[18] results in serious and immediate danger to a large section of society. *West Coast Hotel Co v Parrish,* 300 US 379, 394; 57 S Ct 578; 81 L Ed 703 (1937). This principle, that those who use the public highways may properly be required

360 Mass 1; 271 NE2d 592 (1971). See, also, *Rybeck v Rybeck,* 141 NJ Super 481; 358 A2d 828 (1976), appeal dismissed per curiam as moot, 150 NJ Super 151; 375 A2d 269 (1976), and *Andrew v State,* 238 Ga 433; 233 SE2d 209 (1977).

[17] Only the Courts in *Pinnick,* 360 Mass 1, 25, and *Gentile,* 169 Conn 267, 302-303, expressly approved the involvement of private companies in the insurance rate scheme. However, in *Pinnick,* although the court expressed an opinion on the subject, the Massachusetts No-Fault Act was not compulsory. In *Gentile* the court relied, without examination, on the existence of statutory protection against underwriting and ratemaking abuses by insurers and the state's assigned risk plan.

[18] We recognize that the aforementioned pre-no-fault case law dealt exclusively with mandatory liability or third-party insurance and is therefore distinguishable from the instant no-fault insurance scheme which additionally compels first-party or self-insurance. See Woodroof, Fonseca & Squillante, Automobile Insurance & No-Fault Law (New York: The Lawyers Co-operative Publishing Co, 1974), p 355.

to provide security for loss that may predictably be suffered by others on account of such use, can properly be extended to require security for the loss that the state itself might otherwise incur on account of such use.

## (B) *Due Process*

The protections of the due process clause can only be invoked when there has been state action. *Jackson v Metropolitan Edison Co,* 419 US 345, 349-350; 95 S Ct 449; 42 L Ed 2d 477 (1974).

The No-Fault Act compels insurance for all motor vehicles; failure to comply with this requirement may result in criminal and civil sanctions.[19] In addition, the No-Fault Act specifies the extent of coverage to be provided and the conditions of payment for insurance benefits.[20] Finally, the No-Fault Act and the Insurance Code provide for the assignment of claims and risks.[21] In effect, insurance companies are the instruments through which the Legislature carries out a scheme of general welfare. This legislation goes beyond a grant of a monopoly or an attempt to regulate a utility; there exists "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the [regulated entity] may fairly be treated as that of the State itself". *Jackson v Metropolitan Edison Co, supra,* 419 US 345, 351.

The interest of plaintiffs that is affected by compulsory no-fault insurance is not a previously recognized common-law or constitutional right.

---

[19] See MCL 500.3102(2); MSA 24.13102(2) and MCL 500.3135(2); MSA 24.13135(2).

[20] See MCL 500.3105 *et seq.;* MSA 24.13105 *et seq.*

[21] See MCL 500.3171 *et seq.;* MSA 24.13171 *et seq.* and MCL 500.3301 *et seq.;* MSA 24.13301 *et seq.*

This Court, however, has recognized that the concepts of "liberty" and "property" protected by due process "are not to be defined in a narrow or technical sense but are to be given broad application". *Bundo v Walled Lake,* 395 Mich 679, 690; 238 NW2d 154 (1976). See, also, *Board of Regents v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972), and *Perry v Sindermann,* 408 US 593, 601; 92 S Ct 2694; 33 L Ed 2d 570 (1972).

The existence of interests or benefits entitled to due process protection depends on the extent to which government activity has fostered citizen dependency and reliance on the activity. We are reminded: "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined". *Board of Regents v Roth,* 408 US 564, 577. *The Supreme Court, 1975 Term,* 90 Harv L Rev 86-104 (1976); Tribe, American Constitutional Law, pp 514, 522; *Pennsylvania Coal Mining Ass'n v Insurance Dep't,* 471 Pa 437; 370 A2d 685 (1977).

In Michigan the independent mobility provided by an automobile is a crucial, practical necessity; it is undeniable that whether or not a person can obtain a driver's license or register and operate his motor vehicle profoundly affects important aspects of his day-to-day life.

The cases, statutes and rules affecting the issuance of drivers' licenses reflect an appreciation of the importance of the access to motor vehicles.[22] *Crampton v Dep't of State,* 395 Mich 347; 235 NW2d 352 (1975), and *Gargagliano v Secretary of State,* 62 Mich App 1, 11-12; 233 NW2d 159 (1975), opinion by N. J. Kaufman, J.

---

[22] Various statutes and regulations carefully monitor the licensing of drivers in this state. MCL 257.320(a); MSA 9.2020(a); MCL 257.322; MSA 9.2022; 1974 AACS R 257.1-257.5.

A driver's license, once issued, is a significant interest subject to constitutional due process protections. *Bell v Burson,* 402 US 535, 539; 91 S Ct 1586; 29 L Ed 2d 90 (1971). Although the compulsory insurance requirement of the No-Fault Act does not directly affect the issuance of a driver's license, it directly affects the use of such a license: a licensee may not register or operate a motor vehicle in Michigan without no-fault insurance. A driver's license is, clearly, of little use unless a licensee can register and operate a motor vehicle. We believe that the interest in registering and operating a motor vehicle is as significant as the interest in the use of a driver's license.

In choosing to make no-fault insurance compulsory for all motorists, the Legislature has made the registration and operation of a motor vehicle inexorably dependent on whether no-fault insurance is available at fair and equitable rates. Consequently due process protections under the Michigan and United States Constitutions (Const 1963, art 1, § 17; US Const, Am XIV) are operative.

The Legislature has, additionally, fostered the expectation that no-fault insurance will be available at fair and equitable rates. Section 2403(1)(d) of the Insurance Code states that "Rates shall not be excessive, inadequate or unfairly discriminatory", MCL 500.2403(1)(d); MSA 24.12403(1)(d); § 3301(1)(a) of the Insurance Code provides the "guarantee" that no-fault insurance coverage "will be available to any person who is unable to procure such insurance through ordinary methods". MCL 500.3301(1)(a); MSA 24.13301(1)(a).[23]

---

[23] This is a separate and independent basis for invoking due process protection for Michigan motorists required to purchase no-fault insurance. See *Viculin v Dep't of Civil Service,* 386 Mich 375, 387; 192 NW2d 449 (1971); see, also, *Paul v Davis,* 424 US 693, 710-711; 96 S Ct 1155; 47 L Ed 2d 405 (1976); *Bishop v Wood,* 426 US 341; 96 S Ct

We therefore conclude that Michigan motorists are constitutionally entitled to have no-fault insurance made available on a fair and equitable basis. The availability of no-fault insurance and the no-fault insurance rate regulatory scheme are, accordingly, subject to due process scrutiny.[24]

(1) In scrutinizing the statutory scheme for regulating insurance companies' underwriting and rate-making practices, we must look beyond the No-Fault Act itself to other provisions of the Insurance Code, including the Uniform Trade Practices Act, MCL 500.2400 *et seq.;* MSA 24.12400 *et seq.,* and MCL 500.2001 *et seq.;* MSA 24.12001 *et seq.*

Under the present regulatory scheme, rates and rate-making factors are proposed and supporting material is filed by private insurance companies. MCL 500.2406; MSA 24.12406. The Commissioner of Insurance may approve or reject the proposed rates and rate-making factors. If he takes no action within 30 days, however, "the filing shall be deemed to meet the requirements of this chapter". MCL 500.2408; MSA 24.12408.

An alternative method for filing provides that an insurance company can specify the date upon

2074; 48 L Ed 2d 684 (1976); *Meachum v Fano,* 427 US 215, 226; 96 S Ct 2532; 49 L Ed 2d 451 (1976); *The Supreme Court, 1975 Term,* 90 Harv L Rev 86-104 (1976).

[24] We note that at least two courts have held that consumers have an insufficient interest to invoke due process with respect to utility rates. *Holt v Yonce,* 370 F Supp 374 (D SC, 1973); *Sellers v Iowa Power & Light Co,* 372 F Supp 1169 (SD Iowa, 1974). We believe these cases are distinguishable from the instant challenge to the no-fault insurance rate-making scheme. First, insurance underwriting and rate-making, unlike utility rate-making, inherently involves discrimination among individuals. Insurance policies are written in accord with an insurance company's perception of an individual's risk. Serious equal protection issues are, thereby, implicated. Second, no history of careful rate-regulation exists with respect to the insurance industry. Lewis, Comment: *Insurance Rate Regulation in Pennsylvania: Does the Consumer Have a Voice?,* 81 Dickinson L Rev 297, 304-305 (1977).

which the rate becomes effective. The Commissioner of Insurance then has 15 days within which to act on that filing. If the filing is not disapproved within 15 days of the filing, "the filing shall be deemed to be approved". MCL 500.2430; MSA 24.12430.

The Insurance Code also provides that rating plans may measure any differences among risks that *may* have a probable effect upon losses or expenses. However, such rates shall not be "excessive, inadequate or unfairly discriminatory". MCL 500.2403; MSA 24.12403. See, also, MCL 500.2027; MSA 24.12027.

Manuals pertaining to classifications, rules and rates, rate plans and every modification of any of the foregoing must be filed with the Commissioner of Insurance. MCL 500.2406; MSA 24.12406.

The no-fault insurance rate classifications adopted by the insurance industry are allegedly the result of competition, not the governmental process. Private insurance companies are, and should be, primarily concerned with making a profit, while providing a public service.

We also recognize that it is within the Legislature's authority to prescribe that rates shall be primarily set by competition in the marketplace. However, due process, at a minimum, requires that rates are not, in fact, "excessive, inadequate or unfairly discriminatory" and, further, that persons affected have notice as to how their rates are determined and an adequate remedy regarding that determination.

Although the Legislature has provided some due process protection, significant deficiencies remain. First, the entire rate structure is suspect. The statutory stricture against "excessive, inadequate or unfairly discriminatory" rates is without the

support of clarifying rules established by the Commissioner, without legislatively sufficient definition, and without any history of prior court interpretation. The legislative due process mandate is thus reduced to mere exhortation. When we add that the statute authorizes insurers to utilize any classification scheme which "may measure any differences among risks that *may* have a *probable* effect on losses or expenses" (emphasis added), it becomes clear that rates can be established on insubstantial bases which do not satisfy due process.[25] Absent administrative rules or legislative definition giving substance to the statutory language, there are inadequate safeguards against arbitrary action or invidious discrimination. Davis, Administrative Law of the Seventies, § 6.13 (collecting cases).

Second, the present system of rate regulation denies due process to the motorist attacking the validity of a rate. Filings and supporting information submitted by insurers are open to public inspection only after the filing becomes effective. MCL 500.2406; MSA 24.12406. This certainly is questionable due process. Also, under the Insurance Code, if a complainant, upon administrative review, can convince the Commissioner of Insurance that a filed rate does not meet the statutory requirements, the Commissioner will determine that "within a reasonable period thereafter, such filing shall be deemed no longer effective". MCL

---

[25] See Insurance Bureau, Michigan Department of Commerce, *A Report to the Governor on Essential Insurance in Michigan* (1977), where the Commissioner of Insurance writes, p 35:

"Most importantly, the present law provides completely insufficient tools for insuring that rates are not unfairly discriminatory. It authorizes companies to utilize any classification scheme which ' * * * *may* measure any differences among risks that *may* have a probable effect on losses or expenses.' "

500.2420; MSA 24.12420. This leaves the complainant with the unacceptable choice of paying the invalid rate from the date of the effective filing until the subsequent date when the filing is no longer effective or taking the risk of not having insurance. This is certainly not due process.[26]

(2) In scrutinizing the statutory scheme affecting the availability of no-fault insurance, we again look beyond the No-Fault Act itself to the Insurance Code, Chapter 20, the Uniform Trade Practices Act, MCL 500.2001 *et seq.;* MSA 24.12001 *et seq.,* and Chapter 33, the "Automobile Placement Facility" (or "assigned risk plan"), MCL 500.3301 *et seq.;* MSA 24.13301 *et seq.*

Under § 2027 of the Uniform Trade Practices Act, the Legislature statutorily defines "[u]nfair methods of competition and unfair or deceptive acts or practices in the business of insurance" as including "[r]efusing to insure, or refusing to continue to insure * * * an individual" for a number of patently discriminatory reasons. MCL 500.2027; MSA 24.12027.

In establishing the "Automobile Placement Facility", the Legislature expressly provided "the guarantee that automobile insurance coverage will be available to any person who is unable to procure such insurance through ordinary methods". MCL 500.3301(1)(a); MSA 24.13301(1)(a).

However, although § 2027 of the Uniform Trade Practices Act attempts, through the good offices of the Commissioner of Insurance, to protect from discrimination a motorist who is refused no-fault insurance or whose no-fault insurance is cancelled, the act does not provide such motorists with an individual legal remedy for challenging an alleged discriminatory basis for the refusal or cancella-

---

[26] See *Pennsylvania Coal Mining Ass'n v Insurance Dep't, supra.*

tion.[27] See *Wolff v McDonnell,* 418 US 539, 557-558; 94 S Ct 2963; 41 L Ed 2d 935 (1974).

Furthermore, a motorist placed in the "Automobile Placement Facility" and classified as an "assigned risk" is subject to a statutory presumption that the rates charged will be higher than the rates for motorists in the open marketplace. MCL 500.3365; MSA 24.13365. In addition, a motorist insured by the "Automobile Placement Facility" is exposed to the procedural and substantive inade-. quacies of the facility's rate regulatory scheme (which are, essentially, the same as the inadequacies of the rate regulatory scheme for motorists able to obtain insurance from an insurance company in the marketplace). Also, this facility does not provide the same varieties of coverage options offered in the standard market. Finally, there is no statutory provision allowing such a motorist to challenge his assignment to the "Automobile Placement Facility" with its presumptively higher rates.

Therefore, although no-fault insurance may be available, motorists can be refused no-fault insurance or have their insurance cancelled without effective legal redress for challenging refusal or discriminatory cancellation. Furthermore, motor-

[27] Section 2029 of the Uniform Trade Practices Act provides the Commissioner of Insurance with a means for legal redress to remedy "an unfair method of competition, or an unfair or deceptive act or practice" of a person "engaged in the business of insurance". MCL 500.2029; MSA 24.12029. However, under § 2026 of the Uniform Trade Practices Act, "[u]nfair methods of competition and unfair or deceptive acts or practices in the business of insurance" do not include "isolated incidents", *i.e.,* instances of unfair deceptive acts or practices, etc., affecting a single individual.

We also note that Chapter 32 of the Insurance Code, MCL 500.3204 *et seq.;* MSA 24.13204 *et seq.,* although it provides statutory measures pertaining to automobile liability insurance cancellation, does not protect insureds against potential *discriminatory bases* for insurance cancellation and allows cancellation under conditions not acceptable under a compulsory system.

ists can be placed into the "Automobile Placement Facility" without an assurance of fair and equitable rates, without an opportunity to obtain the same variety of coverage options, or without a right to challenge such placement.

These deficiencies, in our opinion, most certainly deny due process.[28]

(3) These statutory defects as to the availability of no-fault insurance and the scheme for regulating no-fault insurance rates illustrate the inadequacies of the present statutory system of compulsory insurance but do not define what process is "due".

We therefore feel it necessary to identify the concerns which must be addressed in any new system for rate-regulation and "availability", although "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation". *Cafeteria & Restaurant Workers Union, Local 473 v McElroy,* 367 US 886, 895; 81 S Ct 1743; 6 L Ed 2d 1230 (1961).

In determining what process is "due" we consider:

---

[28] In a Report to the Governor on *Essential Insurance in Michigan, supra,* the Commissioner of Insurance states, p 35:

" * * * the rate regulation statutes completely ignore underwriting standards and effectively ignore cancellation decisions. Yet we know that those decisions are equally as critical to competitive and fair rates as are pricing decisions. People underwritten against or cancelled may be forced to pay much higher rates in a 'market of last resort.'"

The Commissioner opines, p 11:

"Many have been shunted into the residual market because of the application of arbitrary and capricious underwriting and cancellation decisions."

Our conclusion that the No-Fault Act's present rate-making scheme and mechanisms for availability are constitutionally deficient echoes the belief of the Commissioner in his letter to the Governor, p i:

"[T]he present system of regulation and the mechanisms for guaranteeing availability are seriously deficient."

" * * * First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v Eldridge,* 424 US 319, 335; 96 S Ct 893; 47 L Ed 2d 18 (1976).

We are concerned that a person's interest in the registration and operation of a motor vehicle may be effectively suspended by the legislative requirement that registrants and operators of motor vehicles purchase no-fault insurance as a condition to the operation of a motor vehicle if no-fault insurance is not made available on a fair and equitable basis.

The current procedures of the Commissioner of Insurance for the promulgation of rates by insurance companies do not provide sufficient assurance that rates and rate-making factors will be substantially justified. Absent adequate procedures, there is a danger that persons similarly situated will ultimately be treated differently with respect to their recognized interest in registering and operating a motor vehicle. See Davis, Administrative Law of the Seventies, § 6.13.

At the same time, we recognize the insurance companies' need for prompt adjustment of rates which provide adequate capitalization and the state's desire to minimize its administrative burden. We are also concerned with the availability of insurance. Individuals must have the knowledge necessary to protect themselves against erroneous or discriminatory underwriting and rate-making decisions. See *Fuentes v Shevin,* 407 US 67; 92 S

Ct 1983; 32 L Ed 2d 556 (1972). There must be available adequate means of redress for such errors and discrimination. See *Dixon v Love,* 431 US 105; 97 S Ct 1723; 52 L Ed 2d 172 (1977). There must also be available adequate means of redress for insurance refusal, discriminatory insurance cancellation, or assignment to the "Automobile Placement Facility" with its presumptively higher rates.

These objectives can be achieved and the procedures harmonized consistent with the due process clause in different ways.

*At a minimum,* this Court holds that no-fault insurance does not satisfy constitutional due process unless:[29]

1. The Legislature and/or the Commissioner of Insurance (pursuant to his present rule-making authority, MCL 500.2484; MSA 24.12484), give substantial meaning to the statutory standards "Rates shall not be excessive, inadequate or unfairly discriminatory". See MCL 500.2403; MSA 24.12403; MCL 500.3340; MSA 24.13340.[30]

2. A filed rate, or a rate determined on administrative or judicial review, provides and sets forth:

a) premiums reasonable to insured and insurer for the specific insurance coverage without regard to factors assertedly warranting differences in premiums among those insured;

b) the factors which properly may be considered by the insurer in differentiating premiums among those insured; and

c) the amount of differential appropriate for each such factor.

---

[29] We emphasize that the following are *minimally* required to satisfy due process. The Legislature can, in its wisdom, choose other enforcement mechanisms assuring adherence to the above principles.

[30] See Davis, Administrative Law of the Seventies, § 6.13.

3. Such information for each insurer[31] is publicized in such a manner that every person affected can readily ascertain the factors and amounts of differentials applicable to him and calculate the premium the insurer may charge.

4. Every motorist has the opportunity to obtain a prompt and effective administrative review of an insurer's calculation of the factors, differentials and premium applicable to him and a prompt and effective administrative review of the basis for the refusal or cancellation of insurance.[32]

(4) Our holding the No-Fault Act's "compulsory insurance requirement" unconstitutional because of the inadequacies that exist in the present statutory system for making no-fault insurance available at fair and reasonable rates raises crucial jurisprudential and social considerations.

We are deeply aware that our holding not only directly affects the problems of motorists and the insurance business in this state, but that it also substantially affects our entire system of civil justice.

We also assume that, because of our otherwise constitutional approval of the general statutory schemata under the No-Fault Act *(e.g.,* the personal injury protection insurance and property damage protection insurance schemata), the Legislature and the Commissioner of Insurance will

---

[31] The Legislature, or Commissioner of Insurance (if so authorized), might, as in other states, establish factors, differentials or premiums uniformly applicable to all insurers. This "minimal" requirement proceeds on the assumption that this will not be required or authorized by the Legislature and that, as now, factors, differentials and premiums may be established based upon the insurer's separate experience.

[32] The Legislature can, of course, choose to prohibit an individual insurer's refusal or cancellation of no-fault insurance by requiring that an insurer establish a system of equitable categories for all 'high risk' persons (for which the insurer can receive some form of legislative protection).

seek to remedy the constitutional deficiencies articulated *supra.*

We therefore believe it best, for purposes of the general jurisprudence, the general welfare of the public, and the administration of justice in our state to hold the "compulsory insurance requirement" of the No-Fault Act unconstitutional (for the reasons articulated *supra) effective as of 18 months from the issuance of this opinion.*[33]

At an appropriate time before 18 months from the issuance of this opinion, we will re-examine

---

[33] See *Robinson v Cahill,* 62 NJ 473; 303 A2d 273 (1973), *cert den* 414 US 976 (1973). In *Robinson,* the New Jersey Supreme Court held that state's education financing scheme unconstitutionally violated equal protection. The Court, in its order, declared:

"The present system being unconstitutional, we come to the subject of remedies. We agree with the trial court that relief must be prospective. The judiciary cannot unravel the fiscal skein. Obligations incurred must not be impaired. And since government must go on, and some period of time will be needed to establish another statutory system, obligations hereafter incurred pursuant to existing statutes will be valid in accordance with the terms of the statutes. In other respects we desire the further views of the parties as to the content of the judgment, including argument as to whether the judiciary may, as the trial court did with respect to the 'minimum support aid' and the save-harmless provision of the 1970 Act, 118 NJ Super [223] at 280-281 [287 A2d 187 (1972)], order that moneys appropriated by the Legislature to implement the 1970 Act shall be distributed upon terms other than the legislated ones. A short date for argument will be fixed." 62 NJ 473, 520-521.

Subsequent to this, the Court issued a per curiam opinion referring to the statement in its opinion that it "desired the further views of the parties as to the content of the judgment". This opinion, essentially identical in substance to our holding, stated, 63 NJ 196, 198; 306 A2d 65 (1973):

"We have had the benefit of further argument. It is our view that the Court should not disturb the statutory scheme unless the Legislature fails to enact, by December 31, 1974, legislation compatible with our decision in this case and effective no later than July 1, 1975. We withhold ruling upon the question whether, if such legislation is not so adopted, the Court may order the distribution of appropriated moneys toward a constitutional objective notwithstanding the legislative directions.

"We retain jurisdiction. Any party may move for appropriate relief, before or after December 31, 1974, if new circumstances so warrant."

See *Governor v State Treasurer (On Rehearing),* 390 Mich 389, 394-395; 212 NW2d 711 (1973).

the constitutional status of the No-Fault Act in terms of remedying the present due process deficiencies. Any party or person wishing to file briefs or be heard shall make timely inquiry of the Clerk as to the proper procedure.[34] This Court will take whatever action appears appropriate at that time.

During the interim period:

1) the Legislature and the Commissioner of Insurance may take whatever action they deem necessary to remedy the due process deficiencies articulated *supra;*[35]

2) §§ 3101(1) and 3101(4) of the No-Fault Act will remain in effect, *i.e.,* motorists will still be required to obtain no-fault insurance as a condition precedent to the registration and operation of a motor vehicle;

3) the No-Fault Act's constitutionally valid provisions, as decided in this opinion and subsequent opinions, will remain in effect.

Until there is legislative or agency response to the due process deficiencies articulated *supra,* the

---

[34] The Legislature, in whatever manner it deems appropriate, is invited to be represented at this Court's re-examination of the constitutional status of the No-Fault Act.

[35] See *Robinson v Cahill* and fn 33, *supra.*

See also, Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich L Rev 471, 559, fn 268 (1970). Professor Sax writes that "In the ideal world legislatures are the most representative and responsive public agencies; and to the extent that judicial intervention moves legislatures toward that ideal, the citizenry is well served". He then perceptively notes, and we agree:

"It should be emphasized that the judicial function is properly invoked principally to deal with issues which, while very important, tend to be made at low-visibility levels, even though they may be endorsed by very highly placed officials. *Conversely, when there is high public visibility on an issue, when it is dealt with as a central matter of state or national policy, and when account has been taken of open and widespread public opinion from all quarters, the judiciary does not ordinarily have a role to play as a perfector of the political process. In such cases, the charge that judicial intervention would amount to displacement of the considered judgment of co-equal branches of the government has merit."* (Emphasis added.)

Commissioner of Insurance shall actively enforce the present regulatory scheme in the spirit of our opinion in order to assure the availability of no-fault insurance at fair and equitable rates during this period.

We also add that all rights accrued by individuals against their insurers or against the "Automobile Placement Facility" until the order in this case is entered remain valid.

## IV.

Although we have held the No-Fault Act's "compulsory insurance requirement" unconstitutional because of insufficient due process protections, effective as of 18 months from the issuance of this opinion, we again emphasize our concurrent holding that "[d]uring the interim period * * * the No-Fault Act's constitutionally valid provisions, as decided in this opinion and subsequent opinions, will remain in effect". Accordingly, we now address the remaining issues in this case properly before us.

All the remaining issues involve due process and equal protection challenges to various statutory schemata of the No-Fault Act. At bottom, these issues are directed at the question of whether the Legislature constitutionally exercised its police power in enacting a particular statutory scheme. Because the constitutional framework employed and discussed with respect to the "compulsory insurance requirement" (i.e., the facial due process sufficiency of the protections provided in the act and other sections of the Insurance Code for available no-fault insurance at fair and equitable rates) was, conceptually, of a different constitutional nature, it is necessary that we discuss the applicable

due process and equal protection tests for these remaining issues.

The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective.[36] See *Michigan Canners v Agricultural Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976).

The test to determine whether a statute enacted .

[36] Plaintiffs and cross-plaintiffs State Farm Mutual and Allstate contend that this Court should apply a more rigorous due process test in deciding those issues involving the abolition of a common-law cause of action in tort. They cite, as authority, speculative dicta in *New York C R Co v White,* 243 US 188, 201; 37 S Ct 247; 61 L Ed 667 (1917), and *Pinnick v Cleary,* 360 Mass 1, 15; 271 NE2d 592, 602 (1971). They ask that we require the Legislature to afford an "adequate substitute remedy" before abolishing a common law cause of action in tort.

We disagree. The "adequate substitute" test is not required by either the United States or Michigan Constitutions. The United States Supreme Court, in *Silver v Silver,* 280 US 117, 122; 50 S Ct 57; 74 L Ed 221 (1929), a case decided after *New York C R Co v White,* flatly declared: "[t]he constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object". In *Pinnick,* the Massachusetts Supreme Court, in choosing to apply a "reasonable and adequate substitute test", correctly recognized that the test was "not constitutionally required". 360 Mass 1, 15-16. Other state courts have also forthrightly rejected the test as constitutionally required. See especially, *Montgomery v Daniels,* 38 NY2d 41, 56; 340 NE2d 444, 453 (1975); and *Jones v State Board of Medicine,* 97 Idaho 859, 869; 555 P2d 399, 409 (1976).

Our Constitution does not recognize a vested right in the continuance of existing remedies for injuries not yet suffered. Article 3, section 7 of our Constitution states that "the common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed". Const 1963, art 3, § 7. As this Court stated in *Mackin v Detroit-Timkin Axle Co,* 187 Mich 8, 13; 153 NW 49 (1915): "Except as to vested rights, the legislative power exists to change or abolish existing statutory and common-law remedies. Common and statute law only remain in force until altered or repealed." See, also, *Myers v Genesee County Auditor,* 375 Mich 1, 7-8; 133 NW2d 190 (1965) (opinion by O'HARA, J.).

This is not to suggest that the Legislature may arbitrarily abolish a common-law remedy. Leaving seriously injured persons without *any* remedy may violate concepts of fundamental fairness and justice which are part of the fabric of constitutional government.

pursuant to the police power comports with equal protection is, essentially, the same. As the United States Supreme Court declared in *United States Dep't of Agriculture v Moreno,* 413 US 528, 533; 93 S Ct 2821; 37 L Ed 2d 782 (1973):

"Under traditional equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest." (Citations omitted.)[37]

In the application of these tests, it is axiomatic that the challenged legislative judgment is accorded a presumption of constitutionality. See *Michigan Canners v Agricultural Board, supra,* 343-344. What this "presumption of constitutionality" means, in terms of challenged police power legislation, is that in the face of a due process or equal protection challenge, "where the legislative judgment is drawn in question", a court's inquiry "must be restricted to the issue whether any state of facts either known or which could reasonably be

[37] Plaintiffs contend that this Court should apply the "substantial-relation-to-the-object" test advanced in *Manistee Bank & Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975). In *Manistee,* we stated this test is applicable in those cases in which "the challenged statute carves out a discrete exception to a general rule *and the statutory exception is no longer experimental"* (emphasis added). 394 Mich 655, 671. The No-Fault Act, not even in effect for five years at the time of this writing, cannot be sensibly characterized as legislation "no longer experimental" in the same way in which the 45-year-old guest statute at issue in *Manistee Bank & Trust Co* unquestionably was.

Plaintiffs also contend that this Court should review this legislation with "strict scrutiny" under the equal protection clauses of the Michigan and United States Constitutions because a "fundamental interest", the right to travel, is involved. We agree with the trial court and the Court of Appeals that under the equal protection clause a person's interest in operating an automobile is not fundamental. *Shavers v Attorney General,* 65 Mich App 355, 364; 237 NW2d 325 (1975). The right to travel protects movement in the sense of migration, not the individual's choice of a particular means of transportation. See *Memorial Hospital v Maricopa County,* 415 US 250, 255-259; 94 S Ct 1076; 39 L Ed 2d 306 (1974).

assumed affords support for it". *United States v Carolene Products Co,* 304 US 144, 154; 58 S Ct 778; 82 L Ed 1234 (1938). A corollary to this rule is that where the legislative judgment *is supported by "any state of facts either known or which could reasonably be assumed",* although such facts may be "debatable", the legislative judgment must be accepted. *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936).[38]

In accord with this axiomatic rule and its corollary a court may uphold the constitutionality of police power legislative judgments in the face of due process or equal protection challenge by taking judicial notice of indisputable, generally known or easily ascertainable facts.[39] And, because the "presumption of constitutionality" is a rebuttable presumption, a party challenging the legislative judgment may attack its constitutionality in terms of purely legal arguments (if the legislative judgment is so arbitrary and irrational as to render the legislation unconstitutional on its face)[40] or may show, by bringing to the court's attention

[38] See *Ferguson v Skrupa,* 372 US 726, 730-731; 83 S Ct 1028; 10 L Ed 2d 93 (1963), where the United States Supreme Court stated:

"[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, 'We are not concerned * * * with the wisdom, need, or appropriateness of the legislation.' Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to 'subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.' * * * We refuse to sit as a 'superlegislature to weigh the wisdom of legislation'." (Citations omitted.)

[39] See *Borden's Farm Products Co, Inc v Baldwin,* 293 US 194; 55 S Ct 187; 79 L Ed 281 (1934). For a recent example of this Court's exercise of this principle, see *People v Poucher,* 398 Mich 316; 247 NW2d 798 (1976).

[40] See *Borden's Co v Baldwin,* fn 39, *supra; Pinnick v Cleary, supra,* 360 Mass 36; 271 NE2d 614 (Tauro, C.J., concurring).

facts which the court can judicially notice, that the legislative judgment is without rational basis.[41]

There are, however, instances in which police power legislative judgments cannot be affirmed or rejected on the basis of purely legal arguments or indisputable, generally known or easily ascertainable facts which can be judicially noticed. In such instances, the facts upon which the existence of a rational basis for the legislative judgment are predicated "may properly be made the subject of judicial inquiry" *(United States v Carolene Products, supra,* 153). Thus, a court may require a trial so that it may establish adequate findings of facts to determine whether, on the one hand, plaintiffs have shown facts which reveal that the legislative judgment is without rational basis, or, on the other hand, whether there is *any* reasonable state of facts on the record which can be produced in support of the legislative judgment.[42]

Such an approach is particularly necessary when the challenged police power legislation is important, complicated, novel or experimental legislation. *Borden's Farm Products Co, Inc v Baldwin,* 293 US 194, 204, 210, 212; 55 S Ct 187; 79 L Ed 281 (1934). See also *Pinnick v Cleary, supra,* 34-37 (Tauro, C.J., concurring). As Chief Justice Hughes declared, writing for a unanimous United States Supreme Court in *Borden's Co v Baldwin, supra:*

"[W]here the legislative action is suitably challenged, and a rational basis for it is predicated upon the particular economic facts of a given trade or industry, which are outside the sphere of judicial notice, these facts are

---

[41] See fn 39, *supra.*

[42] See Note, *The Presentation of Facts Underlying the Constitutionality of Statutes,* 49 Harv L Rev 631 (1936); Alfange, *The Relevance of Legislative Facts in Constitutional Law,* 114 Pa L Rev 637 (1966).

properly the subject of evidence and of findings. *With
the notable expansion of the scope of governmental
regulation, and the consequent assertion of violation of
constitutional rights, it is increasingly important that
when it becomes necessary for the Court to deal with
the facts relating to particular commercial or industrial
conditions, they should be presented concretely with
appropriate determinations upon evidence, so that con-
clusions shall not be reached without adequate factual
support."* (Emphasis added.) 293 US 194, 210.

We believe that the No-Fault Act is substan-
tively analogous in this respect to the legislation
challenged in *Borden's Co v Baldwin.*[43] The chal-
lenged rational bases for the legislative judgments
under the act are "predicated" upon complicated
statistics and actuarial facts of the motor vehicle
insurance "trade" or business (which have sub-
stantial economic consequences). We believe, as did
the Supreme Court in *Borden's Co v Baldwin,* that
the "complexity of problems" inherent in a judi-
cial determination of whether the legislative judg-
ments of the No-Fault Act are constitutional,
"makes it the more imperative that the Court in
discharging its duty, in sustaining governmental
authority within its sphere and in enforcing indi-
vidual rights, shall not proceed upon false assump-
tions". 293 US 194, 210-211. Thus, as Justices
Stone and Cardozo stated in their concurring
memorandum in *Borden's Co v Baldwin:*

"We are in accord with the view that it is inexpedient
to determine grave constitutional questions upon a
demurrer to a complaint, or upon an equivalent motion,
if there is a reasonable likelihood that the production of
evidence will make the answer to the questions clear-
er." 293 US 194, 213.

---

[43] At issue in *Borden's Co v Baldwin* was the constitutionality of the
New York Milk Control Law.

This Court implicitly recognized this approach in *Michigan Canners v Agricultural Board, supra.* At issue in *Michigan Canners* were "important questions of first impression regarding the constitutionality and construction of the Agricultural Marketing and Bargaining Act, MCL 290.701 *et seq.;* MSA 12.94(101) *et seq.".* 397 Mich 337, 340. The circuit court, however, dismissed the challenge on (erroneous) jurisdictional grounds. 397 Mich 337, 342, 344-345. This Court declared:

"As mentioned above, plaintiff has raised important questions regarding the constitutionality and construction of the Agricultural Marketing and Bargaining Act without developing a factual record at trial which would help provide a context in which to consider these questions.

"To resolve these significant issues in such a factual vacuum would be imprudent where it appears that further factual development would substantially contribute to the proper disposition of the case.

"Such is the case here, especially in that Michigan Canners has claimed that the Bargaining Act is unconstitutional because it exceeds the police power of the state. This claim in particular requires full development of facts which might support or undermine the claim that the statute is an invalid exercise of the police power." 397 Mich 337, 342-343.[44]

Therefore, in the face of due process challenges

---

[44] Justice COLEMAN, concurring in this approach, declared:

"Although it is accepted that the concept of police power is somewhat 'elastic in nature', there is a danger here that it be stretched so far as to have no real meaning. Proposed standards such as that which fosters the 'convenience and comfort of the people' or preserves and improves 'social and economic conditions affecting the community at large' could justify almost any imaginable action.

"Remand is proposed because the claim that the statute exceeds the police power 'in particular requires full development of the facts'. I agree with the remand providing that the trial judge develop those facts deemed pertinent, but I would leave discussion of the constitutional question until we have the facts." 397 Mich 337, 351-352.

Therefore, we remanded to the circuit court, asking "both parties to

to the legislative judgments of the No-Fault Act which resulted in various statutory schemata, our task is double-edged. First, we must determine from the record before us whether plaintiffs have overcome the presumption of constitutionality by showing facts which reveal that the legislative judgment is without rational basis, or, to the same effect, we must determine from the record whether the challenged legislative judgment is supported by *any* reasonable state of facts justifying its enactment. Second, we must then determine whether the legislative response bears a reasonable relation to this identified objective.

Similarly, our task is double-edged in considering equal protection challenges to the No-Fault Act. First, we must determine from the record before us whether plaintiffs have overcome the presumption of constitutionality by showing facts which reveal that the legislative judgment is without rational basis or, to the same effect, we must determine from the record whether the challenged legislative judgment is supported by *any* reasonable set of facts indicating that the legislative judgment is in the exercise of a legitimate governmental interest. Second, we must then determine whether the challenged statutory classifications which result from the legislative judgment are reasonably related to this legitimate governmental interest.[45]

## V.

The second issue before us is whether the No-

---

contribute to the development of a factual context which will allow us to properly resolve the issue of the constitutionality of the act". 397 Mich 337, 344.

[45] This Court does not believe a factual context is necessary to decide the facial due process sufficiency of the act's present rate regulatory scheme because of this issue's purely procedural nature.

Fault Act's personal injury protection insurance scheme violates the due process and equal protection clauses of the Michigan and United States Constitutions.

The features of the act's personal injury insurance scheme relevant to the resolution of the due process and equal protection challenges before us are:

1. The owner or registrant of a motor vehicle required to be registered in Michigan must maintain security for payment of benefits under personal injury protection insurance (§ 3101);

2. Tort liability arising from the ownership, maintenance or use within the State of Michigan of a motor vehicle is abolished with respect to accidental bodily injury *except* for non-economic loss "if the injured person has suffered death, serious impairment of body function or permanent serious disfigurement" (§ 3135[1]), intentionally caused harm to persons (§ 3135[2][a]), or damage in excess of the personal injury insurance benefits provided under the act (§ 3135[2][c]). However, tort liability arising from the ownership, maintenance or use within this state of a motor vehicle with respect to bodily injury is not abolished if the operator of the motor vehicle has not complied with the act's mandatory insurance requirements *(i.e.,* if the person is uninsured) (§ 3135[2]);

3. The owner, registrant and operator of an insured vehicle who suffers accidental motor vehicle bodily injury in Michigan or in another state, whether he suffers this injury in his own vehicle or as an occupant of another vehicle or when he is not an occupant of a motor vehicle, is entitled to personal injury protection insurance benefits. The same is true for the "spouse and any relative" of the insured who is "domiciled in the same household" as the insured (§ 3114[1], see § 3110). However, an owner or registrant of a vehicle with respect to which the compulsory requirements of the act are not in effect *(i.e.,* the uninsured Michigan motorist) is not entitled to personal injury protection insurance benefits.

In general, personal injury protection insurance under the act provides:

(a) all medical costs and expenses occasioned by injuries sustained in a motor vehicle accident, including expenses for rehabilitation (see § 3107[a]);

(b) reimbursement up to a maximum of $1,000 a month for loss of income resulting from a motor vehicle accident for a period not exceeding three years. This amount is applied pro rata for shorter periods of work loss. (This limit may be adjusted annually to keep pace with changes in the cost of living.) (§ 3107[b].) Personal injury protection insurance also provides up to $1,000 for funeral and burial expenses (§ 3107[a]);

(c) reimbursement for the cost of replacement of ordinary and necessary services "reasonably incurred", *i.e.,* reimbursement of services the injured person would have performed not for income but for his own personal benefit or the benefit of his household if these services are shown to be "reasonably incurred". Under the act, an injured person may be reimbursed for such services up to a limit of $20 a day for a maximum period of three years. (This limit may be adjusted annually to keep pace with changes in the cost of living.) (§ 3107[b].) The family of the injured person may receive the same reimbursement should the injured person die. (§ 3108.)

## (A) *Due Process*

Plaintiffs contend that the No-Fault Act violates due process by partially abolishing the common law remedy in tort for persons injured by negligent motor vehicle tortfeasors.

We disagree.

As noted *supra,* the Legislature need not provide an "adequate substitute" remedy before abolishing a common-law cause of action in tort; *Mackin v Detroit-Timkin Axle Co,* 187 Mich 8, 13; 153 NW 49 (1915); *Naudzius v Lahr,* 253 Mich 216; 234 NW 581 (1931); *Silver v Silver,* 280 US 117; 50 S Ct 57; 74 L Ed 221 (1929). The abolition of a common-law

tort remedy is measured by the traditional due process test, namely, whether the legislation bears a reasonable relationship to a permissible legislative objective. See discussion, Part IV, *supra.*

We believe that the abolition of the tort remedy for personal injury resulting from motor vehicle accidents was clearly justified by deficiencies in the tort system.

Testimony and documentary evidence presented at trial support the apparent legislative judgment that the tort system of reparations for automobile accident victims had several operational deficiencies:

1. A high percentage of persons injured in automobile accidents received no reparations under the tort system (to collect damages under this system the injured person must be free of any contributory negligence and the accident must be caused by a person who is adjudged to be at fault);[46]

2. Minor injuries were over-compensated and serious injuries were under-compensated;[47]

3. Lengthy delays existed under the tort system in compensating those injured in automobile accidents—

[46] See Exhibit 17, Russell E. Van Hooser, Commissioner of Insurance, *Statement on Automobile Insurance* (1974), and Conard, Morgan, Pratt, Voltz & Bombaugh, *Automobile Accident Costs & Payments* (Ann Arbor: The University of Michigan Press, 1964) to the effect that "only 37% of persons injured in automobile accidents in Michigan received tort recovery".

[47] The trial court summarized the exhibit provided by Professor W. James MacGinnitie of the University of Michigan School of Business Administration as follows:

"His testimony showed that for cases of serious injuries under the tort system, 56.7% of the persons received no compensation; 11.1% received less than 50% of the economic loss, and 10.9% received 50% to 100% of economic loss. The balance of 20.3% received anywhere from 100% to 400% of economic loss."

See, also, Department of Transportation, *Motor Vehicle Crash Losses and their Compensation,* which reports that "for fatally and seriously injured persons with economic losses of $10,000 or more the median aggregate compensation received from all sources was only 35% of their total economic losses". Joint Appendix, p 2674a, and Van Hooser, *Statement on Automobile Insurance, supra.*

often in cases where the need for prompt compensation was strongest;[48]

4. The tort system imposed a heavy burden on the state's court system;[49]

5. The tort liability system discriminated, in terms of recovery, against the uneducated and those persons on a low income scale.[50]

The legislative response, the enactment of the no-fault personal injury protection scheme, reasonably relates to the purpose of correcting these evils. These provisions provide, *inter alia,* for payment without regard to fault within 30 days of claim for all reasonable medical and rehabilitation expenses, for wage loss and replacement services for a period of three years, for survivor's loss of support and services for three years. Such payments may substantially compensate all personal injury victims of motor vehicle accidents for economic loss, including the victims of motor vehicle accidents, who were, under the tort system, uncompensated or undercompensated for their economic losses. Prompt payment provided for under the act may remedy the delays under the tort

---

[48] See Testimony of Chief Deputy Insurance Commissioner Robert Rowe and Department of Transportation study, *Motor Vehicle Crash Losses,* to the effect that there is "an average delay of 16 months for fatalities and serious injuries". Joint Appendix, p 2675a.

[49] See Department of Transportation study, *Automobile Accident Litigation,* Joint Appendix, p 2680a.

[50] The trial court found:

"[t]he percentage of recovery by level of family income increased as the family income increased, and also increased as the level of education increased. For example, those with a family income under $5,000 recovered 38% of their economic loss. Those with family incomes of $5,000 to $9,999 recovered 52% of their economic loss, and those with income over $10,000 recovered 61% of their economic loss. By the same token, those who had only a grade school education recovered 24% of their economic loss. Those with a high school education recovered 53% of their economic loss, and those who had some college training recovered 70% of their economic loss."

See, also, testimony of Dean Lindsey Cowen of Case Western Reserve Law School, Chairman of the Commission of the National Conference of Uniform State Laws.

system. By partially abolishing tort liability to those who suffer personal injuries as a result of motor vehicle accidents, the act may lessen the number of motor vehicle personal injury tort suits in the courts. The prompt availability of compensation for economic losses may relieve the undereducated or those with lower income from the pressure—"legal" or economic—to settle serious claims prematurely and for less than an equitable amount.

For these reasons, we hold that the personal injury protection insurance scheme under the No-Fault Act, in partially abolishing the common-law remedy in tort for persons injured by negligent motor vehicle tortfeasors, does not violate the due process clauses of the Michigan and United States Constitutions.

(B) *Equal Protection*

Plaintiffs contend that the No-Fault Act, by partially abolishing the common-law remedy in tort for persons injured by negligent motor vehicle tortfeasors, violates equal protection by creating two impermissible statutory classifications: (1) motor vehicle tortfeasors and their victims and all other tortfeasors and their victims; (2) victims of insured motor vehicle tortfeasors and victims of uninsured motor vehicle tortfeasors.

We disagree.

The treatment of motor vehicle tortfeasors differently from all other tortfeasors does not violate the traditional test for equal protection. Exhibits were introduced at trial to show that motor vehicle accidents have consistently and by a wide margin been the principal cause of accidental injury and death in Michigan. The State Police

reported that in 1973 approximately 360,000 motor vehicle accidents occurred, resulting in 2,215 fatalities. The legislative judgment to limit its experiment in personal injury reparation to victims of accidents involving motor vehicles is justified by the predictably frequent and serious injury to persons and property resulting from the use of motor vehicles. See *Williamson v Lee Optical Co,* 348 US 483, 489; 75 S Ct 461; 99 L Ed 2d 563 (1955).

Second, the creation of two classes of motor vehicle accident victims—victims of an insured motor vehicle tortfeasor who may not sue below the threshold and victims of uninsured motor vehicle tortfeasors who may sue—does not violate equal protection. This classification, along with penalties imposed by § 3102(2) may serve as an incentive for compliance with the compulsory insurance provision because an uninsured motorist may be liable in tort for all injury suffered by the victim. *McKendrick v Petrucci,* 71 Mich App 200, 207; 247 NW2d 349 (1976).[51] It is significant in this

[51] The right granted victims of uninsured motorists to maintain an action for damages below the statutory threshold is of marginal value. The argument that it unfairly discriminates against victims of insured motorists to deny them the same below-the-threshold recovery assumes erroneously that the right granted victims of uninsured motorists is of comparable value to the right withheld from the victims of insured motorists who as a group are more likely to be responsible than those who are not insured. It also ignores that victims of insured motorists have, perhaps in part because of the *in terrorem* effect of the various sanctions, including this sanction, to which uninsured motorists are subject, a better source of recovery above the threshold—within and above the required policy limits— than victims of uninsured motorists. The classification reflects a legislative policy which, although it discriminates between victims, does not in our judgment constitute an invidious discrimination offending the equal protection clause.

It is a separate question whether the classification invidiously discriminates among uninsured tortfeasors or between uninsured and insured tortfeasors, a question not raised by the plaintiffs and which we need not now consider. Nor need we consider whether, if the classification so invidiously discriminates, the remedy would be to

regard that the Assigned Claims Facility is required to pay benefits to persons who may be injured by uninsured motorists. MCL 500.3171 *et seq.;* MSA 24.13171 *et seq.*

For these reasons, we hold that the No-Fault Act's incidental statutory classification between victims of insured motor vehicle tortfeasors and victims of uninsured motor vehicle tortfeasors does not violate the equal protection clauses of the Michigan and United States Constitutions.

## VI.

The third issue before us is whether the No-Fault Act's property damage protection scheme violates the due process and equal protection clauses of the Michigan and United States Constitutions.

The features of the act's property damage insurance scheme relevant to the resolution of the due process and equal protection challenges before us are:

1. The owner or registrant of a motor vehicle required to be registered in Michigan must maintain security for payment of benefits under property damage protection insurance (§ 3101);

2. Tort liability arising from the ownership, maintenance or use within the State of Michigan of a motor vehicle is abolished with respect to property damage except for intentionally caused damage to property (§ 3135[2]);

3. Tangible ("non-moving") property owned by a third party injured as a result of a motor vehicle accident and motor vehicles parked in such a way as not to cause unreasonable risk of damage are entitled to property damage protection insurance benefits up to $1,000,-

---

eliminate the limitation on recovery below the threshold or to make it applicable to all tortfeasors without regard to whether they are or are not insured.

000 against the insurer of the motor vehicle which inflicted the damage (§§ 3121, 3123[1][a]);

The following damaged property is not entitled to property damage protection benefits: the property of the insured, including the motor vehicle, and tractor attached thereto, or any property of the insured in his motor vehicle (§ 3123[1] subds [a], [b]). Also, property damage protection benefits are not payable for damage to (1) third-party motor vehicles which are parked in such a way as to cause an unreasonable risk of damage, or (2) non-vehicle property arising from out-of-state motor vehicle accidents (§ 3123).

Because property damage to an insured's own motor vehicle is not covered by property protection insurance benefits, the act requires insurers to offer optional first-party collision insurance to provide an insured reimbursement for such damage if he so chooses (§ 3037).

(A) *Due Process*

Plaintiffs and cross-plaintiffs contend that the No-Fault Act violates due process by abolishing the common-law remedy in tort for persons whose property is damaged by negligent motor vehicle tortfeasors.

We disagree.

Again, in resolving this due process challenge, we apply the traditional due process test, namely whether the legislation bears a reasonable relation to a permissible legislative objective.

The trial court found, and the record tends to support its conclusion, that the weaknesses of the tort system of compensation for personal injuries suffered as a result of motor vehicle accidents[52] did

---

[52] The trial court stated: "[T]he former system operated at high efficiency in resolving property damage disputes arising from automobile crashes." See Mehr & Eldred, *Should the Automobile Property Damage Liability Insurance System Be Preserved?*, 48 Notre Dame Lawyer 811 (1973), and Exhibits 162, 163, 164, and the testimony of Richard Kinkade, Joint Appendix, p 1235a.

not affect that system's compensation of property damage. Although the switch from property damage liability coverage to collision coverage may yield some increase in the efficiency of payments, it is apparent from a review of the record that the tort system provided relatively prompt, equitable compensation for damage to property resulting from motor vehicle accidents.

The analysis by the trial court and the Court of Appeals suggests that there must be an identifiable evil which the Legislature intends to correct. We do not believe this is constitutionally necessary. The Legislature is as free to experiment with other ways of dealing with a subject in the hope of making a good system better as it is to correct a perceived evil system.

The property damage section seeks to achieve several goals in addition to prompt, equitable and complete compensation.

Testimony at trial established that the Legislature anticipated that the abolition of a tort action for property damage would have at least four major effects ultimately resulting in lower and more equitable premiums.

First, with the shift from liability to collision insurance resulting from the abolition of tort liability, there would be a new emphasis on the value and repairability of the insured's own motor vehicle; rates would be calculated on the basis of repair costs for that vehicle, rather than, as in liability insurance, on the potential damage to a vehicle of unknown value.[53]

---

[53] See testimony of Professor W. James MacGinnitie:

" * * * [G]reater equity will be achieved in the sense that each individual will be paying a premium related to the size and damageability and characteristics of his own vehicle.

"In the past, he's paid a premium which, in large part, reflected the average of all the other vehicles with which he might be involved in an accident * * * .

Second, an additional anticipated effect of relating premium costs to the insured's car was that this system would create incentives for safer cars.[54]

Third, the abolition of tort liability eliminates the necessity for accident investigations, because a determination of fault is irrelevant to the payment of compensation. The elimination of such investigations, it was hoped, would result in decreased administrative costs and resultant savings on insurance premiums.[55]

Finally, by shifting from a liability to a no-fault system which emphasizes the risk to be insured, not the exposure to some unknown third party, the Legislature anticipated that group insurance would become feasible. Group insurance has been shown to be far less expensive to administer and more likely to result in lower costs. Furthermore, this potential for group insurance may draw large life and group insurance underwriters into the automobile insurance field, resulting in beneficial competition.[56]

The fact that these effects are not yet evident does not diminish the legitimacy of the goals

---

"The equity that is achieved thereby is [that] a small car which has a relatively low value, would carry a lower premium for collision as opposed to a large car, high value [which] would carry the relatively larger premium."

See, also, 13 ULA, Civil Procedural and Remedial Laws, Uniform Vehicle Accident Reparations Act, § 5(a)(4), Comment, p 374, and the testimony of Chief Deputy Insurance Commissioner Robert Rowe, Joint Appendix, p 486a.

[54] See Exhibit 202, New York Insurance Department, *Automobile Insurance—For Whose Benefit?*, pp 119-121; Exhibit 34, United States Department of Transportation, *Motor Vehicle Crash Losses and Their Compensation in the United States* (March, 1971), pp 97, 128-129; and the testimony of Professor W. James MacGinnitie, Joint Appendix, p 2557a.

[55] See testimony of Professor W. James MacGinnitie and Dean Lindsey Cowen, Joint Appendix, pp 1578a, 2072a, and Uniform Motor Vehicle Accident Reparations Act, § 5(a)(4), Comment, p 374.

[56] See testimony of Professor W. James MacGinnitie, Joint Appendix, pp 2043a-2044a.

sought to be achieved or the reasonableness of the means adopted. At this early stage in the functioning of the No-Fault Act these long-term developments cannot yet fully be assessed. Indeed, this litigation itself, with its resulting uncertainty as to the viability of the No-Fault Act, may slow the achievement of the act's goals. Our decision in *Manistee Bank, supra,* is particularly relevant to this aspect of the case: it is precisely because regulation in the economic field often deals with long-term developments that the Court treats such legislation with great deference.

Plaintiffs and cross-plaintiffs emphasize that fault investigations have continued under the No-Fault Act. But that fact is not at this point a relevant consideration.[57] Those investigations may be merely vestigial.

Similarly, plaintiffs and cross-plaintiffs empha-

[57] The trial court and appellee State Farm point to the testimony of Richard Kinkade, witness for and employee of State Farm, who testified that the cost of investigating fault for property damage was 3/10 of 1% of State Farm's earned premiums, $63,215, in 1972. A review of the State Farm report (Exhibit 53) relied on by Kinkade reveals that in 1972 the paid allocated loss adjustment expenses, which includes fault investigations, had substantially greater expenditures for the category of property damage connected with bodily injury ($1,640,284) and bodily injury alone ($1,577,069). It is not clear from the testimony whether the $63,000 figure for property damage reflects those instances where a minimal fault investigation was necessary, nor is it clear what percentage of the figures for property damage were connected with bodily injury and bodily injury investigations. Nevertheless a review of all the figures indicates that the $63,000 sum was an inaccurate estimate of the total fault investigations connected with property damage accidents. The view that fault investigations are a substantial element in the administrative costs of insurance companies is in accord with the testimony of Dean Cowen, contributor to the Uniform Motor Vehicle Accident Reparations Act, and W. James MacGinnitie, Professor of Actuarial Science and Director of the Master of Actuarial Science program at the University of Michigan. Finally, it should be noted that Mr. Kinkade admitted in his testimony that the cost of investigation would be less under no-fault than it was under the tort system. Thus, even if some fault investigation continues under no-fault for certain types of coverage, it will apparently be less intensive or not as common as before.

size the increase in collision premiums resulting from the enactment of No-Fault. Whether or not there has been such an increase and whatever the cause, the important consideration for this Court at this point is to determine whether there existed a permissible legislative objective reasonably related to the statute. We find that the No-Fault Act's property damage protection scheme meets this test and, accordingly, hold the property damage protection scheme does not violate due process.

### (B) *Equal Protection*

Plaintiffs and cross-plaintiffs contend that the No-Fault Act violates equal protection by creating the following statutory classifications: (1) damage to vehicular property is not covered by any mandatory insurance under the act, *i.e.,* property damage claims with respect to this kind of property are covered solely under optional first-party collision insurance, while (2) damage to tangible property and properly parked motor vehicles is covered by mandatory third-party (no-fault) property damage insurance up to $1,000,000 required to be carried by the motorist who inflicted the damage.

We disagree.

Again, as in the equal protection challenge to the personal injury section of the No-Fault Act, we apply the traditional equal protection test.

Plaintiffs' and cross-plaintiffs' equal protection complaint is, in essence, that the Legislature has violated equal protection in providing that persons whose vehicular property is damaged as a result of a motor vehicle accident are to be compensated only if they have chosen to purchase collision insurance. While, on the other hand, the Legislature provided that persons whose tangible prop-

erty or properly parked motor vehicle is damaged as a result of a motor vehicle accident are to be compensated up to $1,000,000 through mandatory third-party (no-fault) property ·damage insurance required to be carried by the motor vehiclist who inflicted the damage.

In discussing this equal protection challenge to the property damage protection scheme, it is necessary to first logically analyze a basic misconception: no-fault and first-party insurance are misnomers in the context of property damage protection. It is not essential that every aspect of the no-fault scheme provide first-party protection, *i.e.,* recovery by the victim from his own insurer. First-party protection is only one method of assuring prompt, equitable recovery.

Under the property protection scheme, owners of tangible property and properly parked motor vehicles collect from the insurer of the motor vehicle which inflicted the damage. Owners of moving or improperly parked motor vehicles may collect compensation from their own insurers, if they have chosen to self-insure.

The different treatment of moving vehicles and tangible property and properly parked vehicles is related to the second conceptual difficulty relating to the use of fault in a no-fault act. Common sense would indicate, and actuarial studies have shown, that in accidents involving motor vehicles and tangible property, the motor vehicle is usually at fault. Consequently, the act makes the motorist strictly liable for the damage he does to tangible property and requires him to purchase insurance for such damage.[58]

---

[58] It is possible that a motorist's insurer will be liable to the owners of stray animals, trains or other non-stationary tangible property which may occasion the damage. The equal protection clause does not, in this context, require that statutory classifications be drawn with

The system, however, functions without regard to fault. That is, there is no determination in each accident of who was at fault. Thus, the appellation "no-fault" is a misnomer only if one concentrates on the initial legislative allocation of responsibility. However, if one looks at the operational effect of the act, it remains a system of insurance without fault.

Section 3121 of the No-Fault Act provides that property protection insurance benefits paid under one policy for all damage to tangible property resulting from an accident shall not exceed $1,000,000. This limit does not violate equal protection (nor due process). It appears from the record that the Legislature sought to limit the absolute liability of insurance companies.[59] The choice of a $1,000,000 limit was justified from an actuarial standpoint.[60]

For these reasons we hold that the No-Fault Act's classification of persons whose vehicular property is damaged as a result of a motor vehicle accident (who are compensated if they have chosen to purchase first-party collision insurance), and those persons whose tangible property or properly parked motor vehicles are damaged (who are compensated up to $1,000,000 through mandatory third-party, no-fault property damage insurance required to be carried by the motorist who inflicted the damage), does not violate the equal protection clauses of the Michigan and United States Constitutions.

---

great precision. *New Orleans v Dukes,* 427 US 297, 303-304; 96 S Ct 2513; 49 L Ed 2d 511 (1976).

[59] See testimony of former Commissioner of Insurance Van Hooser, Joint Appendix, p 2393a.

[60] See testimony of Jerry Hillhouse, which revealed that the difference in providing coverage with a $10,000 limit or a $1,000,000 limit was insignificant.

## VII.

The fourth issue before us is whether § 3101(2) of the No-Fault Act, in excluding two-wheel motor vehicles from coverage under the act, violates the equal protection clauses of the Michigan and United States Constitutions.

Section 3101(2) of the No-Fault Act provides:

"(2) 'Motor vehicle' as used in this chapter, except for section 3103, means a vehicle, including a trailer, operated or designed for operation upon a public highway by power other than muscular power *which has more than 2 wheels.*" (Emphasis added.) MCLA 500.3101(2); MSA 24.13101(2), as amended by 1975 PA 329.

The thrust of plaintiffs' complaint is that the No-Fault Act, by limiting coverage to those vehicles with "more than 2 wheels violates equal protection because it impermissibly treats owners of two-wheel vehicles *(i.e.,* motorcycle owners) differently from owners of vehicles with more than two wheels.

We disagree.

The actuarial data in the record tends to show that motorcycles are rarely at fault in motor vehicle accidents.[61] Also, there was extensive testimony to the effect that in accidents involving motorcycles the drivers and passengers of motorcycles are killed or severely injured at a rate twice exceeding that of those involved in automobile accidents. Thus the inclusion of motorcycles in a no-fault system would result in insurance premiums so high as to preclude most motorcyclists from pur-

---

[61] See testimony of Robert Rowe, Chief Deputy Insurance Commissioner, Joint Appendix, p 364a.

chasing insurance.[62] We believe these are, for pur-
poses of satisfying equal protection, legitimate
governmental interests. The exclusion of motorcy-
cles from coverage under the No-Fault Act is,
quite evidently, reasonably related to these legiti-
mate interests.

We therefore hold that § 3101(2) of the No-Fault
Act, in excluding two-wheel vehicles from coverage
under the act, does not violate equal protection.[63]

## VIII.

The fifth issue before us is whether the No-Fault
Act's statutory scheme with respect to work-loss
reimbursement and reimbursement for replace-
ment services, § 3107, violates the equal protection
clauses of the Michigan and United States Consti-
tutions.

The thrust of plaintiffs' constitutional complaint
is § 3107 violates equal protection: (A) because it
invidiously discriminates between workers in the
home and workers outside the home in terms of
maximum benefits payable in case of injury; and
(B) because it creates an arbitrary statutory classi-
fication by restricting recovery for injuries to those

---

[62] See, especially, testimony of Professor James L. Chastain, Profes-
sor of Insurance and Director of the Insurance Studies Center at
Drake University, Joint Appendix, pp 170a, 1697a-1698a. To the same
effect, see Chief Deputy Insurance Commissioner Robert Rowe's testi-
mony, Joint Appendix, pp 365a-366a, 1857a. See, also, Exhibit 182,
Tab 1, *The Extent of Bodily Injury to Motorcycle Riders* (1973),
Summary, pp 4-5, a study performed by the Insurance Studies Center
of Drake University.

[63] In so holding, we agree with the Court of Appeals that:

"In our delicate task of constitutional review we should not deprive
the Legislature of its ability *to consider the economic aspects* when
deciding how far to extend its reform. *Dandridge v Williams,* 397 US
471; 90 S Ct 1153; 25 L Ed 2d 491 (1970)." (Emphasis added.) 65 Mich
App 355, 368.

See, also, *Gauthier v Campbell, Wyant & Cannon Foundry Co,* 360
Mich 510; 104 NW2d 182 (1960).

employed in the home to expenses "reasonably incurred" for replacement services.

The trial court held that (A) "the classification * * * between those who work for compensation and those who do not work for compensation inside the house is [not] so invidious as to strike it down under the Equal Protection Clause"; (B) "that portion of § 3107(b) requiring that the cost of replacement services must be incurred and subsequently reimbursed is unconstitutional as violative of the Equal Protection Clauses of both the Fourteenth Amendment and the Michigan Constitution". The Court of Appeals did not consider this issue on the merits.

At the threshold we observe that the trial court, in deciding this twofold issue, did not hear testimony. Rather, the court based its decision on "stipulations of fact * * * entered into at the pretrial conference".[64]

In Part IV, *supra,* we ruled that as a matter of constitutional policy, in constitutional challenges to the legislative judgments under the No-Fault Act, this Court requires, at a minimum, that evidence be produced at trial to provide an adequate factual context which might either support or undermine the claim *that the legislative judgment in question* is an invalid exercise of the police power.

Although the trial court did make its decision on

---

[64] "It was * * * stipulated that there are times when a person working within the home performs services equal to the services of those working outside the home, and are not compensated to the same extent as those working outside the home. It was further agreed that there are economic and/or pecuniary losses in the death or injury of a person exceeding the amount allowed under the statute for recovery on a no-fault basis. And it was also stipulated that there is at least one person in the State of Michigan who would be unable to get household help to assist that person, without paying daily for such help and who does not have the money to make such daily cash payments."

the basis of the noted "Stipulations of Facts", we do not feel these stipulations provide an adequate factual context in which we can decide the difficult equal protection issues raised regarding § 3107. For example, the stipulation that "there are times when a person working within a home performs services that are equal to the services of those working outside the home, and who are not compensated to the same extent as those working outside the home" does not indicate whether this happens 90% or 10% of the time. This is a factual determination which could, obviously, present an important consideration. And, the stipulation that "there is at least one person in the State of Michigan who would be unable to [obtain such services on credit] and who does not have the [cash to pay for them]" gives rise to the response, "De minimis non curat lex" ("The law is not based on minimal considerations").

Therefore, we deem it necessary to remand to the trial court so that evidence relevant to the constitutionality of this two-fold issue may be received by that court and constitutionally adjudged in accord with the "traditional" equal protection test articulated in Part IV, *supra.*

We retain jurisdiction as to this issue.

## IX.

The sixth issue before us is whether the No-Fault Act's statutory schemata with respect to nonresident, out-of-state motorists, § 3102(1), which require nonresident motorists to maintain no-fault insurance when they are in Michigan "an aggregate of more than 30 days in any calendar year"; and § 3113, read *inter alia* with § 3135(2), which pertains to transient nonresident motorists, violate

the due process and equal protection clauses of the
Michigan and United States Constitutions.

The trial court held:

"The Court finds § 3102 (1) not violative of either the
Due Process or Equal Protection Clauses of the Four-
teenth Amendment, or those of the Michigan Constitu-
tion. The difference in the treatment of out-of-state
motorists in Michigan an aggregate of 30 days in any
one year is reasonably related to the essential purposes
of the act and is not arbitrary and discriminatory. No
invidiously discriminatory classification is established."

The trial court also held "the provisions of
§ 3113(c) denying a nonresident transient recovery
of personal protection insurance, and also depriv-
ing such transient of tort recovery below the
threshold, is invalid". The court reasoned that
"[the] disparate treatment of resident and nonresi-
dent motorists, and their passengers, violates the
due process and equal protection standards dis-
cussed earlier in this opinion". The court then
stated, correctly, that *"[t]here was no evidence
offered that such disparate treatment was reason-
ably related to any proper legislative purpose, nor
was any evidence offered to justify the classifica-
tion"* (emphasis added).

In the lengthy and extraordinary trial in this
case, neither plaintiffs nor defendants developed
an adequate factual record with respect to the
statutory schemata pertaining to nonresident mo-
torists. We cannot, as a matter of policy, allow the
disposition of these constitutional challenges to
succeed or fail on that basis.

Therefore, we remand to the trial court so that
evidence relevant to the constitutionality of the
above schemata may be received by that court and
constitutionally adjudged in accord with the "tra-

ditional" due process and equal protection tests
articulated in Part IV, *supra.*[65]

We retain jurisdiction as to this issue.[66]

### CONCLUSION

The Court of Appeals and the trial court are
affirmed in part and reversed in part as indicated
by our holdings in this opinion's individual parts.

An appropriate order reflecting the constitu-
tional status of the No-Fault Act will enter 18
months from the issuance of this opinion. GCR
1963, 866.3(b).[67]

No costs, a public question being involved.

KAVANAGH, C.J., and LEVIN and BLAIR MOODY,
JR., JJ., concurred with WILLIAMS, J.

RYAN, J. *(concurring in part, dissenting in part).*
I dissent from the judgment of my colleagues in
holding unconstitutional the compulsory insurance
section, 3101(1), of 1972 PA 294, known hereafter
as the Act or the No-Fault Act. At this juncture I
would uphold the constitutionality of the above
provision as well as the other challenged provi-
sions of the Act.

For succinctness and ease of analysis, my opin-

---

[65] We wish to bring to the attention of the trial court the fact that
an inconsistency exists between the requirement that a nonresident
obtain no-fault insurance when present in Michigan for "an aggregate
of more than 30 days in any calendar year" (§ 3102[2]), and the
requirement that persons operating a "pleasure" vehicle in Michigan
"for a period exceeding 90 days" register their vehicles in this state
(MCLA 257.243[c]; MSA 9.1943[c]).

[66] With respect to the issues remanded (see discussion, Part VIII
and this part), the trial court shall proceed on the premise that the
specific statutory schemata involved are severable and will not be
revised by the Legislature.

If the Legislature sees fit to revise either or both schemata, the trial
court can then dismiss the suit as to these issues as moot.

[67] Amended effective January 23, 1978, 402 Mich cxlviii.

ion is divided into sections to correspond with the respective sections of the majority opinion.

## PART I. INTRODUCTION

I concur with the majority opinion.

## PART II. STANDING

One month prior to the date 1972 PA 294 became effective,[1] the initial plaintiffs brought an action challenging the constitutionality of the Act, while asking for declaratory and injunctive relief. Subsequently, the pleadings were amended and parties were added in an effort to better arrange a more exhaustive constitutional challenge. Plaintiffs claimed standing pursuant to GCR 1963, 201.2(3) or, alternatively, GCR 1963, 521.1.

GCR 1963, 201.2(3) is designed to permit five or more residents of this state who own property assessed for direct taxation by the county where they reside to bring an action to prevent the illegal expenditure of state funds or to test the constitutionality of a statute relating thereto. I agree with the majority conclusion that GCR 1963, 201.2(3) does not contemplate the expenditure of state funds incidental to the operation of a regulatory scheme. Because the state funds required to be expended under the No-Fault Act are merely those costs incidental to the implementation and enforcement of the Act, the plaintiffs do not have standing to challenge the Act's constitutionality under that rule.

In the alternative, plaintiffs seek declaratory judgment pursuant to GCR 1963, 521.1 which provides:

---

[1] Plaintiffs filed a complaint for declaratory and injunctive relief on August 28, 1973. The No-Fault Act became effective October 1, 1973.

"In a case of *actual controversy* within its jurisdiction, any circuit court of this state may declare the rights and other legal relations of any interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." (Emphasis added.)

Before relief can be granted under this rule, plaintiffs must allege and prove an "actual justiciable controversy". "Actual controversy" encompasses something more than simply the plaintiffs' "need to know" in order to guide their future conduct.

In addition, "actual controversy" connotes the pursuance of an honest and actual antagonistic assertion of right by one party against another. A noncollusive adversary proceeding, as distinguished from a contrived friendly lawsuit, is critical, both pragmatically and constitutionally, to the proper performance of the judicial function. Outside of the constitutional provision for advisory opinions, Const 1963, art 3, § 8, this Court limits its resolution of controversies to instances where the stakes of the disputants are committed and the issues developed in adversary proceedings upon trial. *Request for Advisory Opinion on the Constitutionality of 1977 PA 108,* 402 Mich 83; 260 NW2d 436 (1977).

Despite the manifestly contrived nature of the instant action, I would allow plaintiffs standing under GCR 1963, 521.1 because of the compulsory nature of the no-fault scheme. Resident plaintiffs who own and operate automobiles are compelled under threat of civil and criminal sanctions to purchase the no-fault insurance. The pleadings allege that various parties are financially unable to buy no-fault insurance coverage and are therefore subject to those sanctions. We need not hypothecate future events in determining that some

of the plaintiffs in this very limited respect are factually in a position antagonistic or adverse to the named state officials whose duty it is to implement the compulsory coverage provisions.

Although "actual controversy" arises solely out of the compulsory coverage provisions, plaintiffs also have standing to challenge other provisions in the Act because of their specific interest in those provisions and because of the allegedly integrated nature of the scheme. Accordingly, in an effort to prove 1972 PA 294 constitutionally infirm, the plaintiffs have the requisite standing to raise the issues addressed in the majority opinion.

## PART III. COMPULSORY INSURANCE

The first substantive issue addressed in the majority opinion is whether § 3101 of the No-Fault Act, which requires owners or registrants of motor vehicles to maintain compulsory personal injury protection insurance, property damage insurance and residual liability insurance, is constitutional.[2]

Presumably there are a number of theories upon which a challenger might fashion an attack upon the constitutionality of § 3101. It might be claimed that the statute as applied violates equal protection guarantees of the state and Federal Constitutions, denies due process as applied, or simply is an arbitrary or unreasonable statutory mandate.

---

[2] "The owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance, property protection insurance and residual liability insurance. Security shall be in effect continuously during the period of registration of the motor vehicle." MCLA 500.3101(1); MSA 24.13101(1).

The majority has erroneously framed the issue in terms of registrants and *operators*. In actuality, the Act mandates only owners or registrants to insure their motor vehicles. Individuals are not required to provide no-fault security by virtue of being the operators of motor vehicles.

There may be other bases for challenge as well. Whatever the theory of attack, however, and no matter what specific claims a party might make in a judicial challenge to the constitutionality of the provision, one fundamental principle of orderly appellate review should govern: A party wishing to make a claim of unconstitutionality must raise it on appeal before the court of appellate review. There are a number of reasons for such a rule including, of course, the fundamental proposition that an appellate court of final and discretionary review does not, in the proper performance of its function, conjure up issues of interest or even of great importance which the litigants have not raised or asked the court to decide.

The majority ignores this elemental precept of the appellate function and, acknowledging that the plaintiffs did not expressly raise the issue on appeal, "feel compelled to address it because of its basic, threshold importance to any decision we might render as to the No-Fault Act's constitutionality".[3] I cannot acquiesce in legitimatizing such an approach to the appellate function. It is just that sort of "this ticket for this train for this day only" ad hoc rule for appellate review which has invited the criticism that this Court is often long on policy and short on judicial restraint.

It is manifest that the No-Fault Act, currently in its experimental stages, is novel, and some say revolutionary, legislation affecting literally millions of people and a billion dollar industry in

---

[3] Footnote 14, p 594 of the majority opinion states:

"Although plaintiffs did not expressly raise on appeal the issue decided by the trial court, 'Can the Legislature constitutionally, as a condition precedent to [registration and] operation of a motor vehicle, require the purchase of no-fault personal protection insurance and no-fault property protection insurance * * * ' we feel compelled to address it because of its basic, threshold importance to any decision we might render as to the No-Fault Act's constitutionality."

ways utterly beyond our ability to foresee. It is imperative therefore that this Court proceed in a carefully informed manner before declaring upon the constitutionality of the compulsory no-fault insurance scheme. By disregarding the proper scope and conditions of appellate review, the majority has deliberately precluded the possibility of a better informed decision. Because the trial court heard no evidence whatever supporting any claim of inadequate casualty insurance regulation, and since none of the parties nor any of the amici either briefed or argued the "compulsory insurance" issue, the majority was able to raise and resolve the issue unburdened by any factual record and upon freewheeling speculation. In the absence of a factual basis to illuminate and give meaning to § 3101 and the manner in which it is applied, the majority has fashioned a strictly facial attack upon its constitutionality. In so doing the majority has assumed the role of the advocate rather than that of the impartially reviewing court. In assuming that posture, the majority has jeopardized, indeed abandoned, the objective and neutral stance so necessary to the proper performance of the judicial function. The inevitable result, of course, is that the Court has forsaken its ability to reach a sound decision as evidenced by its dogged determination to raise and resolve an issue which was neither contentious nor preserved, and its adoption of a most anomalous resolution of that issue.

My brothers discuss the issue of the constitutionality of the "compulsory insurance requirement" of § 3101 in the framework of two questions:

(a) Can the Legislature constitutionally, as a condition precedent to registration and operation of a motor vehicle, require the purchase of no-fault personal protection insurance and no-fault property protection in-

surance or, in the alternative, require security approved
by the Secretary of State?

(b) Does the present regulatory scheme for compul-
sory no-fault insurance sufficiently protect the interests
of registrants and operators of motor vehicles in accord
with the due process clause of the Michigan and United
States Constitutions as to (1) the fairness of insurance
rates, and (2) the proper availability of insurance?

For the reader's benefit, I shall address the issue
within the same framework.

(a) Can the Legislature constitutionally, as a condi-
tion precedent to registration and operation of a motor
vehicle, require the purchase of no-fault personal pro-
tection insurance and no-fault property protection in-
surance or, in the alternative, require security approved
by the Secretary of State?

Authorities are abundant and unanimous that
under the police power the state may regulate
travel upon its public highways. *Stapleton v Inde-
pendent Brewing Co,* 198 Mich 170; 164 NW 520
(1917); *Bowerman v Sheehan,* 242 Mich 95; 219
NW 69 (1928); *People v Thompson,* 259 Mich 109;
242 NW 857 (1932); *DeVries v Secretary of State,*
329 Mich 68; 44 NW2d 872 (1950). The power of
the Legislature to control the operation of motor
vehicles upon the highways of this state includes
the power to enact legislation affecting the recipro-
cal rights and duties of all owners, operators, or
occupants arising out of such operation. This
sphere of control is the outgrowth of the state's
interest in mitigating the detrimental conse-
quences of highway motor vehicle accidents and is
expressed through the enactment of legislation
designed to insure a party's financial responsibility
to others[4] as well as to himself.[5] The legislative

---

[4] See *DeVries v Secretary of State, supra; Larr v Secretary of State,*
317 Mich 121; 26 NW2d 872 (1947).

[5] See *Helvering v Davis,* 301 US 619; 57 S Ct 904; 81 L Ed 1307
(1937); *Carmichael v Southern Coal & Coke Co,* 301 US 495; 57 S Ct
868; 81 L Ed 1245 (1937).

decision to accomplish those legitimate goals by mandating the purchase of no-fault insurance by Michigan motor vehicle owners and registrants is clearly within the state's police power. The constitutional validity of the no-fault scheme is properly assessed not only as a police power regulation, but also as an integral part of the authority and interest of the state in licensing motor vehicle operators and the vehicles they own and operate.

Obviously the imposition of this "compulsory insurance" requirement upon all owners or registrants of motor vehicles required to be registered in this state may well work something of a burden upon certain persons under certain conditions. However, the imposition of such a burden is not, per se, unconstitutional. The Legislature is vested with wide discretion not only to determine what is inimical to the public welfare, but also to determine what is fairly designed to protect the public against the evils which might otherwise occur. The expediency, the wisdom, the desirability, or even the fairness, in the abstract sense, of the specific means selected by the Legislature to advance legitimate public interests is strictly within the discretion of the lawmaking body and not subject to judicial veto, providing the means chosen do not offend constitutional safeguards. In pursuance of its determination to accomplish the goals stated heretofore, the Legislature may validly condition the operation of a motor vehicle upon the procurement of no-fault personal injury protection and property damage protection insurance.

(b) Does the present regulatory scheme for compulsory no-fault insurance sufficiently protect the interests of owners or registrants of motor vehicles in accord with the due process clause of the Michigan and United States Constitutions as to (1) the fairness of insurance rates, and (2) the proper availability of insurance?

It is with regard to this question that I believe my brothers' reasoning is most seriously erroneous and in consequence of which today's action is taken. I shall attempt, first, to identify and explain the reasoning which *must have* fathered the majority opinion and then to demonstrate how the well-known constitutional principle upon which the majority depends has been misapplied.

The majority holds that the "compulsory insurance" requirement of § 3101 denies due process unless the government takes certain necessary steps to assure that all persons required to purchase no-fault insurance have an opportunity to do so on "fair" terms.

Although positing the view that some Michigan motorists are, in effect, denied the operation of their motor vehicles because of an inability to obtain insurance at justified, reasonable rates, the majority does not support such a conclusion with a factual record because none exists. There being no evidentiary basis upon which to predicate the assumption of the claim of unavailability of insurance, nor even appellate argument claiming it, the majority is forced to resort to an involved analysis by which an attempt is made to identify fair and equitable insurance rates as an "interest" warranting procedural protection under the due process provisions of the state and Federal Constitutions. Accordingly, the "interest" identified by the majority is an alleged "statutory entitlement" to no-fault insurance on a fair and equitable basis.

Although arguing that persons have a "statutory entitlement" to fair and equitable insurance rates, the majority meticulously avoids defining or delineating the scope of the term "statutory entitlement". Concededly, the United States Supreme Court has never explicitly defined a "statutory

entitlement", nor does this form of property interest lend itself to easy definition. However, certain attributes of a "statutory entitlement" are sufficiently established in United States Supreme Court decisions to enable one to extrapolate a tentative definition of the concept.

A statute creates an entitlement claim to a governmental benefit if it defines the conditions under which the benefit must be granted or if it sets out the specific and sole conditions under which the benefit may be denied.[6] Once the cognizable benefit is conferred or received, the individual beneficiary has a sufficient property interest in the benefit to warrant due process protection in the event the government attempts to withhold or deny the benefit.[7] Underlying this concept of a property interest to which there is an entitlement is the rationale that the recipients of governmental benefits place a reliance upon the continued receipt of those benefits which must not be arbitrarily undermined.[8]

In attempting to identify the enjoyment of fair and equitable insurance rates as such an entitlement interest, the majority ignores certain absolutely essential attributes of entitlement interests, which will be discussed hereafter, while focusing extensively upon other attributes. In declaring that there exists an entitlement interest in fair and equitable insurance rates, the Court focuses upon two factors which it claims raise insurance rates from an important if abstract economic con-

[6] See *Goldberg v Kelly,* 397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970); *Arnett v Kennedy,* 416 US 134; 94 S Ct 1633; 40 L Ed 2d 15 (1974).

[7] See *Board of Regents v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972); *Bell v Burson,* 402 US 535; 91 S Ct 1586; 29 L Ed 2d 90 (1971).

[8] See *Goldberg v Kelly, supra.*

cern to a constitutionally protected property interest, to wit: (1) a citizen's dependency and reliance upon fair and equitable no-fault insurance rates; and (2) the action of the Legislature in fostering an expectation that no-fault insurance will be available at fair and equitable rates.

In finding the necessary citizen dependence or reliance, my brothers reason that simply because "independent mobility provided by an automobile is a crucial practical necessity * * * " and "whether or not a person can obtain a driver's license or register and operate his motor vehicle profoundly affects important aspects of his day-to-day life", there exists therefore a constitutionally protected property interest in such registration and operation.

The next step my brothers take is to conclude that because the new found property interest one has in registering and operating a motor vehicle upon the highways is conditioned upon the procurement of no-fault insurance, constitutionally based procedural guarantees are also applicable to enable one to fulfill the condition. The result of such reasoning, of course, is that the provision established by the Legislature (compulsory purchases of no-fault insurance) as a condition to the exercise of the constitutionally protected entitlement interest (registering and operating one's motor vehicle upon the highways) is, through bootstrapping argument, itself elevated to a constitutionally protected entitlement interest.

Apparently recognizing that the element of citizen reliance standing alone is not sufficient to create the entitlement interest to which due process protections attach, the majority finds "a separate and independent basis for invoking due proc-

ess protection for Michigan motorists required to purchase no-fault insurance", *viz.,* legislative enactments, independent of the compulsory no-fault insurance scheme which "fostered the expectation that no-fault insurance will be available at fair and equitable rates".[9]

That somewhat convoluted route leads the Court to the conclusion that because of what it perceives to be inadequate procedural protections guaranteeing the availability of no-fault insurance at fair and equitable rates, the "compulsory insurance" requirement of § 3101 is unconstitutional.

The fundamental error in the reasoning of the majority is in the assumption that there is a property interest or entitlement, in the constitutional sense, in the availability of no-fault insurance at fair and equitable rates.

Essentially, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has *already acquired* in specific benefits". (Emphasis added.) *Board of Regents v Roth,* 408 US 564, 576; 92 S Ct 2701; 33 L Ed 2d 548 (1972). When such benefits are terminated, the constitutional right to a hearing provides an opportunity for a person to vindicate his claim to such benefits. *Board of Regents v Roth, supra,* 577. Obviously, procedural due proc-

---

[9] "(1) All rates shall be made in accordance with the following provisions:

\* \* \*

"(d) Rates shall not be excessive, inadequate or unfairly discriminatory." MCLA 500.2403(1); MSA 24.12403(1).

"(1) Every insurer authorized to write and writing automobile bodily injury liability and property damage liability insurance in this state shall participate in an organization for the purpose of:

"(a) Providing the guarantee that automobile insurance coverage will be available to any person who is unable to procure such insurance through ordinary methods." MCLA 500.3301(1); MSA 24.13301(1).

ess is not required until a benefit is abridged or otherwise threatened.

At the very outset my brothers err in concluding that the mandatory no-fault insurance scheme is an abridgment of the property interest one has in registering and operating his motor vehicle. The error is the result of an improper analysis of the essence of an entitlement interest. The analysis is deficient in two respects.

First, there is a failure to recognize that the property interest to which a citizen has an entitlement, and which is involved in this case, derives from the action of the state in registering or licensing a motor vehicle, a benefit which, once conferred, permits the use of a motor vehicle upon the public highways.

The concept of the *present enjoyment* of the benefit appears to be an essential attribute of the protected interests in property under the entitlement doctrine. The attribute of present enjoyment is consistent with the rationale of the recipient's dependency and reliance upon the government activity.

"*Once licenses are issued,* as in petitioner's case, *their continued possession* may become essential in the pursuit of a livelihood." (Emphasis added.) *Bell v Burson,* 402 US 535, 539; 91 S Ct 1586; 29 L Ed 2d 90 (1971).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has *already acquired* in specific benefits." (Emphasis supplied.) *Board of Regents v Roth, supra,* at 576.

"The emerging and underlying principle is clear; once a cognizable benefit is conferred or received, governmental action must not be employed to deprive or infringe upon that right without some form of prior hearing. We are unaware, however, of any authority for

the proposition that the full panoply of due process protections attaches every time the government takes some action which confers a new status on the individual or denies a request for a different status." *Scarpa v United States Board of Parole,* 477 F2d 278, 282 (CA 5, 1973).

Second, there is a failure to appreciate that the legislative command that no-fault insurance be obtained as a condition precedent to the registering of a vehicle does not terminate or even abridge one's entitlement to that benefit, but merely defines, in part, the perimeters or dimensions of the benefit.

An individual does not possess, in the abstract, a property interest in the operation of his vehicle upon Michigan's highways. Rather, the property interest lies in his status as a registrant or licensee recipient of the entitled benefit. Until an individual acquires such licensure or proves his eligibility for it, he does not have a legitimate claim of entitlement to it. Essentially, the requirement of no-fault insurance simply conditions or defines one aspect of the eligibility for the benefit. Until an individual fulfills the eligibility requirement of obtaining no-fault insurance, he does not have a valid claim of entitlement to operate his vehicle in Michigan.

The property interest at issue was created by the Legislature and, within constitutional limitations, the Legislature is free to define its dimensions. *Board of Regents v Roth, supra,* 577. The condition of obtaining no-fault insurance, which is applicable to all motor vehicle registrants, is no more than a partial determinant of such dimensions. So long as the condition is not palpably arbitrary or unreasonable, it does not offend due

process.[10] *Michigan Canners v Agricultural Board,*
397 Mich 337; 245 NW2d 1 (1976); *Grocers Dairy
Co v Department of Agriculture Director,* 377
Mich 71; 138 NW2d 767 (1966); *Carolene Products
Co v Thomson,* 276 Mich 172; 267 NW 608 (1936).

To so condition the issuance of such a license
does not run afoul of Fourteenth Amendment
procedural guarantees.

"If the statute barred the issuance of licenses to all
motorists who did not carry liability insurance or did
not post security, the statute would not, under our
cases, violate the Fourteenth Amendment." *Bell v Bur-
son, supra,* 539.

The majority implies that the Legislature recog-
nized a constitutionally protected property interest
in fair and equitable rates when it enacted legisla-
tion toward that end. Moreover, because of this
claimed interest in fair and equitable rates, the
majority opines that procedural guarantees must
be effectuated in connection with the rate making
process.

The validity of the statement by the majority,
implying that the Legislature has recognized an
*interest* in fair and equitable insurance rates by
"foster[ing] the expectation that no-fault insurance

---

[10] As expressed in question (a), the condition of no-fault insurance is
reasonably related to the state's interest in mitigating the detrimen-
tal consequences of highway motor vehicle accidents. Moreover, the
various underwriting guidelines currently employed by state regu-
lated casualty insurers are not alleged to be arbitrary or discrimina-
tory either by the majority or the plaintiffs on appeal. Although that
challenge is not made in the instant case, it is made in Connecticut's
counterpart to *Shavers, Gentile v Altermatt,* 169 Conn 267; 363 A2d 1
(1975). The Connecticut court, relying on a regulatory scheme virtu-
ally identical to that enacted in Michigan, rejected the challenge to
the underwriting guidelines under the traditional due process and
equal protection tests. See Conn Gen Stat Ann 38-201c, amended
since the *Gentile* decision. See Conn Gen Stat Ann (Supp 1978) 38-
201c.

will be available at fair and equitable rates", is necessarily dependent upon a showing that the alleged *interest* in fact exists. Since, as explained above, there does not exist, in the abstract, an interest in fair and equitable insurance rates, the interest in such rates, allegedly recognized by the Legislature, must exist, if at all, within the framework of this statutory scheme alone. Accordingly, we must determine whether the statutory provisions cited by the majority create an entitlement interest in such rates.

The relevant provisions of the legislative enactment upon which my brothers rely are the following:

"(1) All rates shall be made in accordance with the following provisions:

* * *

"(d) Rates shall not be excessive, inadequate or unfairly discriminatory." MCLA 500.2403(1); MSA 24.12403(1).

"(1) Every insurer authorized to write and writing automobile bodily injury liability and property damage liability insurance in this state shall participate in an organization for the purpose of:

"(a) Providing the guarantee that automobile insurance coverage will be available to any person who is unable to procure such insurance through ordinary methods.

"(b) Preserving to the public the benefits of price competition by encouraging maximum use of the normal private insurance system.

"(2) The organization created under this chapter shall be called the 'Michigan automobile insurance placement facility.'" MCLA 500.3301(1); MSA 24.13301(1).

The suggestion that, by enacting a regulatory scheme, the Legislature established a property interest in the subject matter of the regulation is

constitutionally unsound. As explained earlier, a statute creates an entitlement to a government benefit when it declares the conditions under which the benefit must be granted or the conditions under which the benefit may be denied. Rather than creating or recognizing the existence of a property interest, the first cited provision, § 2403(1), sets the standards for the casualty insurers and the Commissioner of Insurance to follow when making casualty insurance rates.

The cases cited by the majority (footnote 23, pp 599-600, majority opinion) in support of the claim that there exists an interest in "fair and equitable insurance rates", do not, in my view, stand for the stated proposition that there exists "a separate and independent basis for invoking due process protection for Michigan motorists required to purchase no-fault insurance". Rather, the cases clearly narrow and limit instances in which procedural guarantees attach to situations in which there is not only a dependency or reliance upon the alleged interest, but also a legislative recognition of the interest at issue. *Paul v Davis,* 424 US 693; 96 S Ct 1155; 47 L Ed 2d 405 (1976); *Bishop v Wood,* 426 US 341; 96 S Ct 2074; 48 L Ed 2d 684 (1976); *Meachum v Fano,* 427 US 215; 96 S Ct 2532; 49 L Ed 2d 451 (1976); *The Supreme Court, 1975 Term,* 90 Harv L Rev 86-104 (1976).

MCL 500.3301; MSA 24.13301, cited by the majority (p 599, majority opinion) as independently supporting the claim of legislative recognition of an interest in fair and equitable rates, merely provides for the creation of the "Michigan automobile insurance placement facility". The provision compels insurers to participate in the assignment of high risks in order to make coverage available to all, while preserving to the public the benefit of

price competition through the maximum use of the normal private insurance system. Outside of citing this provision in the context of its independent basis argument, the majority does not explain how it recognizes an interest in "fair and equitable insurance rates".

Even if the majority was correct in concluding that there is a constitutionally protected entitlement interest in "fair and equitable insurance rates", there has been no showing that the compulsory insurance provision of the Act either terminates or abridges the continued enjoyment of such interest. As indicated heretofore, Fourteenth Amendment procedural protection of property is a safeguard of interests a person has already acquired and procedural due process is not applicable until a state threatens to terminate or otherwise abridge the benefit. Although the majority alleges that a property interest in "fair and equitable rates" does in fact exist, their discussion is without any illustration demonstrating how no-fault's compulsory insurance scheme abridges or terminates this interest. The majority does not discuss the essential factor of termination or abridgment of a property interest which triggers the procedural guarantees, because it is obvious that the compulsory insurance scheme in no sense abridges any interest in fair and equitable insurance rates. The action of the Court in declaring the compulsory insurance scheme unconstitutional is, to say the least, an anomalous approach to assuring procedural safeguards for the enjoyment of such benefits.

In summary, I am persuaded that the requirement of security imposed upon *all* motor vehicle owners by the No-Fault Act, as a condition precedent to the operation of motor vehicles, does not

violate Fourteenth Amendment procedural guar-
antees. More specifically, the statutory require-
ment, on its face, does not even raise Fourteenth
Amendment procedural due process questions.

In today's novel declaration of unconstitutional-
ity in futuro, for lack of procedural safeguards, the
majority initiated inquiry, defined issues and objec-
tives, and has attempted to coerce a solution.

There being no adversarial claims before the
Court concerning the issue which is decided today,
the compulsory insurance provision is struck down
not by the adjudication of specific claims, but upon
an inherently generalized approach to an abstract
problem.

Perceived weaknesses, inequities, uncertainties
and a concern for the *potential* unfairness of the
compulsory insurance provision of the Act are
elevated to the level of constitutional shortcomings
to justify judicial veto. Impingement upon the
legislative function in today's judgment is glar-
ing.[11] Lacking the appropriate plenary power to
effectuate the desired purpose, the Court's declara-
tion of unconstitutionality, in futuro, is used as a
bludgeon to motivate, even compel, the Legislature
and the Commissioner of Insurance to regulate the
casualty insurance industry in conformance with
the will of the Court.[12] To this end my brothers

---

[11] Article 3, § 2 of the 1963 Constitution provides:

"The powers of government are divided into three branches: legisla-
tive, executive and judicial. *No person exercising the powers* of one
branch shall exercise *powers properly belonging to another branch
except as expressly provided in this constitution.*" (Emphasis sup-
plied.)

Judicial power is the authority to hear and decide controversies and
to make binding orders and judgments respecting them. *Johnson v
Kramer Bros Freight Lines, Inc,* 357 Mich 254, 258; 98 NW2d 586
(1959).

Constitutional duty of courts is to interpret and apply law, not to
enact laws. *School District of the City of Pontiac v Pontiac,* 262 Mich
338, 353; 247 NW 474, 247 NW 787 (1933).

[12] The majority characterizes their bludgeon as an attempt to soften

have even proffered a "minimal" plan unburdened by any experience, expertise or understanding of the myriad factors which are implicated in the rate making process of the industry.

In its disposition of this issue, the Court has strayed from the constitutional limits of its judicial authority and usurped the legislative function. There is a difference between the Court's *power* to make today's judgment of unconstitutionality and its proper *authority* to do so. In the instance at hand, the latter has given way to the former and the price is further erosion of the ever weakening doctrine of judicial self-restraint.

## PART IV. DUE PROCESS AND EQUAL PROTECTION TESTS APPLICABLE TO THE NO-FAULT ACT

I concur with the majority opinion.

## PART V. CONSTITUTIONALITY OF THE PERSONAL INJURY PROTECTION SCHEME UNDER THE NO-FAULT ACT

I concur with the majority opinion.

## PART VI. CONSTITUTIONALITY OF THE PROPERTY DAMAGE PROTECTION INSURANCE SCHEME UNDER THE NO-FAULT ACT

I concur in the result reached by the majority.

---

the blow in holding the No-Fault Act unconstitutional at some future date if the necessary legislative action isn't taken in the interim period. The majority cites *Robinson v Cahill*, 62 NJ 473; 303 A2d 273 (1973), in support of such an approach. A review of the subsequent case history evidences the impropriety of such an approach. See *Robinson II*, 63 NJ 196; 306 A2d 65 (1973); *Robinson III*, 67 NJ 35; 335 A2d 6 (1973); *Robinson IV*, 67 NJ 333; 339 A2d 193 (1975); *Robinson V*, 69 NJ 449; 335 A2d 129 (1976); *Robinson VI*, 70 NJ 155; 358 A2d 457 (1976); *Robinson VII*, 70 NJ 464; 360 A2d 400 (1976).

The specific constitutional issues raised with respect to the property damage protection scheme are as follows:

(a) Whether the No-Fault Act violates the due process clauses of the Michigan and United States Constitutions by abolishing the common-law remedy in tort for persons whose property is damaged by negligent motor vehicle tortfeasors;

(b) Whether the No-Fault Act violates the equal protection clauses of the Michigan and United States Constitutions by creating the following statutory classification: (1) damage to vehicular property is not covered by any mandatory insurance under optional first-party collision insurance, while spect to this kind of property are covered solely under optional first-part collision insurance, while (2) damage to other tangible property and properly parked vehicles is covered by mandatory no-fault property damage insurance up to $1,000,000 required to be carried on the vehicle which inflicted the damage.

In accord with the so-called traditional test to determine whether the no-fault scheme comports with due process, we inquire only whether the statute bears a reasonable relation to a permissible legislative objective. The learned trial judge, rather than focusing his inquiry upon the question whether the new statutory scheme bore a reasonable relationship to permissible objectives, directed his inquiry into the efficiency of the former tort property damage idemnification system. After concluding that the traditional tort system operated with adequate efficiency, the trial court held "that there was no social objective to be served by abrogating tort rights of owners of property damaged by negligent tortfeasors". Because of this overly restrictive analysis of the constitutional

issue, the trial court's legal conclusion was erroneous.

As elucidated in the majority opinion, "The Legislature is as free to experiment with other ways of dealing with a subject in the hope of making a good system better as it is to correct a perceived evil system." When the trial court's analysis focused only upon the latter consideration, its inquiry into possible legislative objectives was necessarily incomplete. Upon reviewing the record, the majority found several legitimate goals which would justify the enactment of the property protection scheme. Under the deferential approach inherent in the traditional due process test, I agree that there were legitimate objectives, other than those noted by the trial court, to warrant the legislative action.

With respect to the equal protection claim, plaintiffs and cross-plaintiffs argue that the Legislature has arbitrarily treated the subject of damage to moving highway vehicles differently from that inflicted upon other tangible property. As was observed in Part III (compulsory insurance), the Legislature has a legitimate interest in mitigating the detrimental consequences of motor vehicle accidents. Generally speaking, this is the fundamental objective of the No-Fault Act. A quick perusal of the Act makes evident the fact that the scheme is designed to insure one party's financial responsibility to others as well as to himself. In accord with this objective, the no-fault scheme provides for compulsory third-party property damage protection insurance payable without regard to fault. Stated differently, the Act mandates the owner or registrant of a motor vehicle required to be registered in Michigan[13] to procure third-party

---

[13] In addition, the Act mandates the nonresident owner or regis-

beneficiary insurance,[14] payable without regard to fault for damage inflicted by his motor vehicle to tangible property. Out of this class of tangible property there is carved the exception of vehicular property[15] designed for operation on a public highway.[16] Damage to this class of property is excluded from property protection benefits. Plaintiffs and cross-plaintiffs argue that such statutory classifications are not rationally related to a valid objective of the No-Fault Act.

I do not agree.

In addition to the goal of assuring financial responsibility for motor vehicular inflicted damage to tangible property, the Legislature had other goals in mind. One of them involved cost considerations. As elucidated by the majority, the Legislature sought to make vehicle protection coverage more equitable by allocating premium expense for that protection exclusively to first-party collision coverage. Vehicle damage protection rates would thereby be calculated strictly on the basis of repair costs for one's own vehicle, rather than including in the liability coverage a cost for the potential

trant who operates or permits his motor vehicle to be operated in this state from an aggregate of more than 30 days in any calendar year to continuously maintain security for the payment of benefits. § 3102(1).

[14] In order to limit the absolute liability of the insurance company, the Legislature established a $1,000,000 ceiling on the mandatory third-party property damage insurance. The choice of the $1,000,000 ceiling was justified from an actuarial standpoint.

[15] Unless the vehicle is parked in such a way as not to cause unreasonable risk of the damage which occurred. § 3123(1)(a).

[16] In addition to the vehicle exclusion, § 3123 excludes from property protection insurance benefits "[p]roperty owned by a person named in a property protection insurance policy, his spouse or a relative of either domiciled in the same household, if the person named, his spouse or the relative was the owner, registrant or operator of a vehicle involved in the motor vehicle accident out of which the property damage arose", § 3123(1)(b), and "property damage arising from motor vehicle accidents occurring out of this state", § 3123(2).

damage to a vehicle of unknown and therefore unascertainable value. Essentially, there is a resultant shift in insurance premiums from the liability coverage to the vehicle collision coverage. With this shift the Legislature intended that premiums would more closely reflect the value of the vehicle one drives while affording a more significant premium saving to one who does not purchase the optional first-party vehicle coverage. Additionally, the Legislature hoped that this shift from liability to first-party coverage might make group insurance feasible as well as create incentives for buying more crashworthy highway vehicles.

Including moving highway vehicles within the general tangible property class and affording them third-party property protection benefits would frustrate the aforementioned objectives without significantly advancing the interest of financial responsibility.[17]

PART VII. WHETHER § 3101(2) OF THE NO-FAULT ACT WHICH EXCLUDES TWO-WHEEL MOTOR VEHICLES FROM COVERAGE UNDER THE ACT IS CONSTITUTIONAL

I concur with the majority opinion.

---

[17] Because of the fact that vehicles "parked in such a way as not to cause unreasonable risk of the damage which occurred" are logically blameless, and because treating such parked vehicles similarly to other tangible property would not have a significant impact on the aforementioned premium objectives, the Legislature reasonably afforded such parked vehicles no-fault property protection benefits.

"[E]very line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function." *Village.of Belle Terre v Boraas,* 416 US 1, 8; 94 S Ct 1536; 39 L Ed 2d 797 (1974); and see *New Orleans v Dukes,* 427 US 297; 96 S Ct 2513; 49 L Ed 2d 511 (1976).

Part VIII. Constitutionality of the No-
Fault Act's Statutory Scheme with
Respect to the Work-Loss Reimbursement
and Reimbursement for Replacement
Services (§ 3107)

The essence of the plaintiffs' complaint is: (1) that § 3107 violates the equal protection clauses of the Michigan and United States Constitutions because it invidiously discriminates between workers in the home and workers outside the home in terms of maximum benefits payable in case of injury; and (2) that § 3107(b) violates the equal protection clauses of the Michigan and United States Constitution because it creates an arbitrary classification by restricting recovery for injuries to those employed in the home to expenses "reasonably incurred" for replacement services.

Reduced to its simplest, the equal protection guarantees of both constitutions mean that the Legislature may not take what may be termed a "natural class of persons", split that class in two, and then arbitrarily designate the severed factions of the original unit as two classes and thereupon enact different rules for the treatment of each. However, when there is a natural difference between the situation or circumstances of the two classes of persons, the Legislature may be justified in treating them differently. The state enjoys a wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary. *Orient Ins Co v Daggs,* 172 US 557; 19 S Ct 281; 43 L Ed 552 (1899).

There is a practical reason for the Legislature to make a distinction between benefits for work loss and the replacement of ordinary and necessary services. Reimbursement for the former lends it-

self to determination on the basis of an individual's prior wage scale, while ordinary and necessary services performed in the home are not susceptible of valuation under the same criterion. Moreover, whereas replacement costs for ordinary and necessary services are susceptible to being incurred, one cannot ordinarily incur the cost of a substitute to perform the job of the accident victim. Additionally, the fact that the ordinary and necessary services must be incurred before reimbursement serves not only a valuation function, but also a prophylactic function which has not been shown to be unreasonable. Finally, the different maximum limits imposed by the Act appear reasonably related to their reimbursement functions.

In my view, there is no need for a remand of this matter for the taking of evidence.

PART IX. CONSTITUTIONALITY OF THE NO-FAULT ACT'S STATUTORY SCHEME WITH RESPECT TO TRANSIENT NON-MICHIGAN MOTORISTS AND NONRESIDENT OCCUPANTS OF MOTOR VEHICLES NOT REGISTERED IN MICHIGAN

Essentially, plaintiffs complain that this statutory scheme violates due process and equal protection guarantees by denying no-fault benefits to the transient nonresident who has not obtained insurance from an insurer who has filed a certification in compliance with § 3163 of the Act.

I do not agree.

Rather than representing an arbitrary and capricious exercise of legislative power, this exclusion merely recognizes the realities of the situation. The Legislature, cognizant of the extent of its authority over out-of-state motor vehicles, reasonably excludes from the compulsory coverage

scheme out-of-state motor vehicles which are not operated in Michigan for an aggregate of more than 30 days in any calendar year. Those nonresidents who do not voluntarily procure the no-fault coverage quite reasonably do not receive the concomitant no-fault benefits. Under the traditional test, legislation is presumed to be constitutional if any state of facts reasonably may be construed to justify the legislative action and the classifications therein. From the record made below, it does not appear that the presumption is overcome.

Again, I perceive no benefit to be gained by a remand of this issue for further trial court action.

## CONCLUSION

In finding the No-Fault Act constitutional, I am compelled to make explicit the following observation. The above holdings are dispositive of the challenges to constitutionality of the No-Fault Act as leveled in this lawsuit by the plaintiffs and raised by the majority, and no more. Upon a different factual predicate, another plaintiff, in the future, may well raise arguments and produce evidence sufficient to persuade me that the presumption of constitutional validity which weighs heavily today is overcome or that, as applied, the act is unconstitutional.

In reviewing the issues before us, I have been acutely conscious that the proper discharge of the judicial function, when evaluating new legislation for constitutional validity, is very narrow. It is to determine whether there is any rational relationship between the goals sought to be accomplished and the means chosen to do so. Our stated and restated deference to the legislative function, as embodied in the familiar doctrine of presumptive constitutional validity, is no mere verbalism. Its

source is the doctrine of separation of powers and its life blood is judicial self-restraint. We are not free to strike down this revolutionary new concept of compensation for motor vehicle caused injury and damage because we may think it to be unwise or even at odds with our personal notions of what is fair. We test for constitutional collision. If there is none, like it or not, we ought to decline to disturb the legislative will. Stated otherwise, our review and judgment must be such as to not unduly hamper the Legislature's freedom to experiment and innovate by superimposing our judgment as to the expediency or wisdom of the legislation over theirs. This necessary policy of deference affords the Legislature ample scope for putting its prophecies to the test of proof. The case before us is a contrived lawsuit brought one month prior to the date 1972 PA 294 became effective and is necessarily deficient in presenting evidence of the actual impact, across the board, of the no-fault scheme. Essentially, the plaintiffs produced before the trial court a body of evidence similar to that considered by the Legislature when that body was deliberating upon the propriety of adopting the scheme. That evidence included, *inter alia,* legislative facts, actuarial data, expert opinion, fiscal projections and professorial theorizing. Much of the evidence is imprecise, even highly speculative. Upon examining all of it, considering the findings of fact by the trial court, and applying those established principles of constitutional law which I have discussed, over all of which is superimposed the presumption of constitutional validity, I am persuaded that the Act is constitutionally sound.

COLEMAN, J., concurred with RYAN, J.

FITZGERALD, J. *(concurring in part, dissenting in*

*part).* I write to make a few brief observations. I would uphold the constitutionality of the challenged provisions of 1972 PA 294, MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.,* as amended. At this juncture, the act, under our traditional due process and equal protection standards, is a reasonable legislative method of assuring that victims of automobile accidents are promptly and adequately compensated.

The gist of plaintiffs' many complaints about the no-fault insurance act is that the act is a heavy-handed solution to non-existent problems in a workable tort system. Plaintiffs miss the point. Justice Levin's observation in *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 680; 232 NW2d 636 (1975), is pertinent:

"Courts should proceed cautiously and should defer to legislative judgments which are reasonable. The Legislature must be free to experiment without being required to attain 'mathematical nicety' in its formulation of remedies to social and economic problems."

I would not remand any of the issues in this case for a factual determination. Because this case arises in a declaratory judgment posture, the "facts" to be gleaned on remand must necessarily be somewhat speculative. I see nothing to be gained by remanding for more current discourse on plaintiffs' perceived evils of the no-fault system. The act is not yet beyond the experimental stages.

I, too, am concerned about the procedural due process issue. I cannot, however, conscientiously reach the merits of that issue in the posture of this case. Footnote 14 of the majority opinion shows that the constitutionality of compulsory no-fault insurance in the context of rate-setting procedures was not appealed to this Court. The "actual

controversy" requirement for issuance of a declaratory judgment might well be met had plaintiffs raised the issue.[1] Plaintiffs may have standing to raise the issue and the question may be ripe for decision, but the fact remains that plaintiffs did not question procedural due process in rate regulation or insurance availability. I suspect the litigants will be quite surprised at the outcome of this case.

Assuming *arguendo* that the issue of the merits of compulsory insurance/procedural due process was before us, I can not find a constitutional due process violation without a factual record. I do not address possible due process violations based on the entitlement doctrine relied upon by the majority because to do so does not square with my conception of the process that is due litigants from the court system.

I cannot say the question of due process protections arises in a case where no plaintiff has claimed an entitlement or a denial of due process. Due process does not exist in a vacuum. The leading entitlement cases spring from a ruling adverse to the plaintiff. See, for example, *Bundo v Walled Lake,* 395 Mich 679; 238 NW2d 154 (1976) (refusal to renew liquor license); *Bell v Burson,* 402 US 535; 91 S Ct 1586; 29 L Ed 2d 90 (1971) (suspension of driver's license); *Goldberg v Kelly,*

---

[1] While the declaratory judgment rule, GCR 1963, 521, is to be liberally construed and administered, the granting of a declaratory judgment is still a matter of judicial discretion. To raise an issue *sua sponte* on appeal from a lower court declaratory judgment is extraordinary. I am puzzled by the majority's statement that "before affirmative declaratory relief can be granted, it is essential that a plaintiff, at a minimum, pleads facts entitling him to the judgment he seeks and proves each fact alleged, *i.e.,* a plaintiff must allege and prove an actual *justiciable* controversy" and reference to *Kuhn v East Detroit,* 50 Mich App 502; 213 NW2d 599 (1973), *lv den,* 391 Mich 815 (1974). I read *Kuhn* as strong authority for not deciding the procedural due process issue here.

397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970) (termination of welfare benefits); *Board of Regents v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972) (refusal to grant tenure); *Arnett v Kennedy,* 416 US 134; 94 S Ct 1633; 40 L Ed 2d 15 (1974) (dismissal of Federal civil servant); and *Bishop v Wood,* 426 US 341; 96 S Ct 2074; 48 L Ed 2d 684 (1976) (dismissal of policeman).

The law on the entitlement doctrine is not so clear but that I feel an adversary presentation is necessary to decide whether an entitlement exists. Likewise, such a presentation is needed to decide whether the requisite state action is present.[2] Moreover, determining what due process protections are required by the Constitution ought to involve a balancing of the interests of consumers, insurance companies and the state agency charged with regulating the insurance industry.[3] I would

[2] One author offers the following observation concerning Pennsylvania's insurance rate-making scheme, which appears essentially similar to our own:

"Pennsylvania's insurance rate regulation procedure, despite its failure to provide for public notice and hearing before rates go into effect, does not appear susceptible to challenge under the due process clause of the fourteenth amendment. It is unlikely that a court would consider the state's role in the process to constitute state action. Nor, if the public utility analogy is employed, do consumers have a property interest in fixed insurance rates."

He goes on to say:

"The lack of serious constitutional objections to the present rate-making scheme suggests that the resolution of the problem may lie in legislative rather than judicial hands."

Lewis, Comment: *Insurance Rate Regulation in Pennsylvania: Does the Consumer Have a Voice?,* 81 Dickinson L Rev 297, 309 (1977).

[3] The Insurance Commissioner has indicated some of the pertinent considerations:

"The concern for essential insurance availability and regulation manifests itself in several ways which at first glance seem unrelated. Some people cannot easily find the necessary insurance at all. Others, though they can find insurance, feel that the rate charged is unfair, either in absolute terms or in comparison to the rate charged to others. A third category of consumers find their choice of company limited so that they are unable to select the quality of service they would prefer, or are hesitant to shop among companies because they

prefer to hear what those interests are[4] before deciding what is minimally required to satisfy due process.

While there may come a time when the people of the State of Michigan deserve an opinion on a question not raised by the litigants, requiring us to assume facts not in the record, the instant case does not warrant such judicial initiative. I would not today take judicial action to precipitate a crisis at the risk of hasty and ill-conceived reform. At this juncture I would leave what some perceive as a crisis in the hands of those who best understand the problems and solutions.

In a proper case, at another time when the procedural due process issue is properly raised, and a factual record is developed so that we can determine whether or not "rates are * * * , in fact, 'excessive, inadequate or unfairly discriminatory' ", my decision could be otherwise. This Court should bide its time until that proper case arrives.

I cannot accept the majority's attempt to soften the blow by holding the act unconstitutional at some future date if no legislative or agency action is taken. As authority for that procedure, *Robinson v Cahill*, 62 NJ 473; 303 A2d 273 (1973), is

fear cancellation of their coverage. The public also questions the extent and nature of government involvement in the marketplace. On the one hand, there is little dispute that government should intervene in the free marketplace where the marketplace will not by itself act in the public interest. On the other hand, there is a strong and growing sense that government regulation has come to intervene in cases where it is unnecessary and may in fact be a negative influence. All of these concerns are pertinent to Michigan, and must be examined if sound public policy is to exist."

Insurance Bureau, *A Report to the Governor: Essential Insurance in Michigan* (1977), p 4.

[4] Some of the considerations to be balanced are listed in Comment: *Entitlement, Enjoyment, and Due Process of Law,* 1974 Duke L J 89, 120-122.

cited. That decision, invalidating New Jersey's method of financing public schools through local and *ad valorem* taxation of real property, is now commonly referred to as *Robinson I.* A look at the later history of that case convinces me that this Court ought not follow a similar procedure.[5]

In sum, today's action by the majority potentially junks a workable solution to a problem of importance to the entire population and dictates to the Legislature in a manner neither seemly nor called for. The Court embarks on a perilous course of grave consequence to everyone.

COLEMAN, J. *(concurring in part; dissenting in part).* Although I have signed the opinion of Justice RYAN because it provides a detailed analysis of the majority's Part III approach to the "No-Fault" Insurance Act (MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.),* I concur also with Justice FITZGERALD's forthright opinion. In addition, I express a separate concern which embraces the whole of this heretofore unperceived constitutional doctrine, today born full grown without benefit of facts, briefs, oral arguments, prior consideration of any lower court and without knowledge of the plaintiffs or defendants.

---

[5] See *Robinson II,* 63 NJ 196; 306 A2d 65 (1973) (court would not disturb statutory scheme previously held unconstitutional unless Legislature failed to enact by December 31, 1974, legislation compatible with *Robinson I); Robinson III,* 67 NJ 35; 335 A2d 6 (1975) (court declined to determine a remedy for the 1975-76 school year); *Robinson IV,* 67 NJ 333; 339 A2d 193 (1975) (court mandated provisional remedies for the 1976-77 school year). The provisional remedies were not put into effect because the Legislature did enact a statutory scheme designed to remedy the constitutional defects noted in *Robinson I.* In *Robinson V,* 69 NJ 449; 355 A2d 129 (1976), the court found the new statute facially constitutional, conditioned on the assumption that complete funding would follow. The court retained jurisdiction. When complete funding did not follow the court issued an injunction freezing spending for New Jersey's public schools, *Robinson VI,* 70 NJ 155; 358 A2d 457 (1976). The injunction was dissolved by order on July 9, 1976 because the Legislature provided for funding by enacting a state income tax, *Robinson VII,* 70 NJ 464-465; 360 A2d 400 (1976).

I

Justice WILLIAMS writes the truth when he says:

"The interest of plaintiffs that is affected by compulsory no-fault insurance is not a previously recognized common-law or constitutional right."

He also truly warns:

"We are deeply aware that our holding not only directly affects the problems of motorists and the insurance business in this state, but that it also *substantially affects our entire system of civil justice.*" (Emphasis added.)

Indeed it does. It is a giant step towards government *management* of private enterprise through judicial mandate. With no facts and little or no claimed expertise in the insurance industry, the majority assumes a stance of power and sweeps out to transform the management of an entire private industry into a *state* function and therefore subject to such regulation as has been reserved for state agencies. The majority finds that "[t]his legislation goes beyond a grant of monopoly or an attempt to regulate a utility" and so the action of the automobile insurance industry must "be treated as that of the state itself".

Like modern day legal alchemists, the Court has managed to transform the insurance rate-setting process from what was essentially a series of private actions with some governmental supervision to that magical "state action" which opens the door to "state action" constitutional controls. The astonishing display of bootstrapping used to achieve this feat—because the state requires the public to purchase a certain product from a pri-

vate business as a prerequisite to engaging in a certain private activity, the action of that business is thus state action—dangerously blurs the necessary and important distinction between private enterprise and public government.

By analogies of "apples and oranges"[1] (as described in the other minority opinions) and an analysis based on a factual vacuum and highly questionable premises,[2] a new face has been

---

[1] *E.g.*, compare with the issuance of driver's licenses, liquor licenses, etc. discussed in Justice Fitzgerald's opinion.

[2] (1) The Insurance Code protects against "excessive, inadequate or unfairly discriminating rates", a standard commonly employed throughout the country and in Michigan. Nevertheless, the majority finds the standard a "mere exhortation" in the absence of "legislative definition" and "without any history of prior court interpretation". First, like "fair and equitable prices", any single "definition" is unlikely to cover the innumerable factual possibilities. Facts and circumstances are necessary against which to test the standards. Facts are lacking here, so understandably we were not expected by the parties to test the statutory protection in a vacuum. The Commissioner or the judiciary will be able to judge fairly what is an "excessive, inadequate or unfairly discriminatory rate". The words are ordinary and widely used in statutes and regulations. Even if it were true that there is "no history of court interpretation" of this standard, one has to ask, "How does such a history begin?"

Noting that the same standards apply to all insurance in Michigan, and have for many years, I wonder how this finding of inadequacy will affect all other areas of the industry.

(2) The majority say that there are inadequate statutory provisions for a motorist attacking the validity of an individual rating decision. I see no bar to an individual's attack upon the base rate nor an attack upon an arbitrary or capricious individual premium or assignment of risk.

Also the Uniform Trade Practices Act in MCL 500.2027; MSA 24.12027 specifically includes within its protection discrimination against individuals. Among other prohibitions are

"(a) Refusing to insure, or refusing to continue to insure, or limiting the amount of coverage available to an individual or risk because of any of the following:

"(i) Race, color, creed, marital status, sex, or national origin * * * .

"(ii) The residence, age, handicap, or lawful occupation of the individual or the location of the risk * * * ."

See (iii) for additional property insurance protections, including refusal to insure or to continue to insure and charging of different rate.

(3) The third complaint is similar to the second alleging "no

painted on the concept of "due process".[3] It is not becoming. It is not practical. It is dangerous.

## II

It is unbecoming and even dangerous because it is precedent for the Michigan Supreme Court *sua sponte* to contrive an "issue" and to use it as a vehicle to "affect the entire system of civil justice" and, incidentally, freedom of the marketplace in Michigan.

If four people can, unsolicited, manipulate the Constitution so as to dictate to the Legislature in precise terms the method of removing one industry effectively from the competitive field of free enterprise, what business or industry will be next?[4]

The opinion lays the groundwork for government (judicial?) regulation of private industry such as our people have never countenanced. "Super-regulation" would be a suitable—and kind—name for the concept.

## III

The opinion as to Part III is not only unbecom-

adequate statutory provision permitting an individual to challenge insurance refusal, discriminatory cancellation, or assignment to the 'Automobile Placement Facility' with its presumptively higher rates". In addition to the Uniform Trade Practices Act, see MCL 500.3220, 500.3244; MSA 24.13220, 24.13244, for statutory procedure for insurance cancellation. An even *more strict bill is being argued* in the Legislature at this writing.

[3] The Fourteenth Amendment of the United States Constitution provides

"nor shall any State deprive any person of life, liberty, or property, without due process of law".

In Michigan, Const 1963, art 1, § 17 provides:

"No person shall be * * * deprived of life, liberty or property, without due process of law."

[4] I suspect it may be the remainder of the insurance industry.

ing to the judiciary and dangerous to a free society, but it is impractical because it uses a costly "blunderbuss to kill a fly". For instance, it creates a right in *every* dissatisfied motorist (in 1975 there were 5.7 million vehicles registered in Michigan and 6.0 million licensed drivers) to obtain a "prompt and effective administrative review" of *an insurer.* Because this Court lacks the experience and expertise within its membership or the means peculiar to the Legislature of acquiring it, we cannot assess the financial impact upon the customers and taxpayers in general (often the same people).

At a minimum, we must anticipate for this requirement alone a corps of additional administrative law judges, attorneys for both sides, court reporters and other staff, quarters, equipment and other necessities.

Note also that "all rights accrued by individuals against their insurers or against the 'Automobile Placement Facility'" will "remain valid" until the order of the Court is entered, so a formidable backlog already will exist at the very beginning.

In any event, this requirement alone can be calculated to raise costs to taxpayers and raise premium costs which even at the present high level are a bargain nationally for unexcelled coverage.[5]

---

[5] A recent State Insurance Bureau report to the Governor (the 1977 report is cited by the majority) concluded:

"No-fault insurance is paying more benefits to more accident victims in a more timely manner than any other automobile insurance system in the country. No-fault is also saving about $45 million per year in insurance costs because of benefit coordination with a potential savings of at least $105 million.

\* \* \*

"No-fault collision is also providing people with more options to control their insurance rates through self-insuring portions of their coverage. It also increases equity by making more people pay only for repairing their own car and not for repairing the average car. \* \* \*

"Finally, no-fault has not been directly responsible for increases in

Such Part III requirements are certainly not necessary under any present concept of constitutional law. Nor are they necessary to accomplish the ends of fairness (see fn 2).

Perhaps all of us, including the insurance companies, would like to see some changes in the act. Even without this extraordinary judicial tack, changes are likely to take place where they should —in the Legislature.

Be that as it may, the majority imposes upon us its philosophy of "the more governmental regulation, the better". I believe that broader, rather than tighter, regulatory perimeters are basic to efficient, less expensive, more competitive production. In fact, business—especially small and medium-sized business—already is sinking in a sea of bureaucratic, costly red tape.

While trying to kill the fly, we may be crippling or dealing a mortal blow to a free marketplace. We cannot know the complete impact of this decision upon this and other business. The Legislature and the Governor have been making studies and holding hearings to determine what changes are indicated in the act after the first five years of experience. We should not *sua sponte* usurp their functions.

## IV

In summary, my greatest and separately ex-

insurance rates. The increase in insurance rates in Michigan has been consistent with the rate increases in other comparable states—both tort and no-fault. Also, insurance rates in Michigan over the past several years have not increased as rapidly as the prices of products the insurance purchases. In addition, no-fault has saved almost $70 million per year from the costs of a tort system. The public is concerned about rate increases, but this is a national phenomenon, independent of no-fault." Insurance Bureau, *A Report to the Governor: No-Fault Insurance in Michigan: Consumer Attitudes and Performance* (1978), pp 60-61.

pressed concern with the majority opinion is two-fold: (1) Part III is precedent for our Court to make decisions removing the very foundations of our legal process without any facts, briefs, arguments of counsel, lower court consideration or knowledge of the parties, and (2) in the course of such show of power, it becomes precedent also for a blurring almost to extinction of the lines between private enterprise and governmental action. Indeed, the opinion converted a private industry into a function of the government and warned us of more to come—and all this quite unnecessary to the desired end.

Although I do not agree with—or even understand[6]—some of the other arguments and requirements, my concern runs so deeply towards enhancing, and not undermining, our basic freedoms, including that of the marketplace, that I have focused briefly and quickly (after having read all

---

[6] *E.g.,* Part III sets forth certain requirements, § 2 of which seems to contradict itself. Subsection (a) requires that premiums be set "without regard to factors assertedly warranting differences in premiums". Subsection (b), however, requires a statement of factors which may be considered by the insurer in differentiating premiums among those insured and (c) requires "the amount of differential appropriate for each such factor".

Does the 2(a) requirement mean that all premiums for the same coverage be the same as to each person (as to the same company)? Do 2(b) and (c) allow specified classifications for specified risks at specified amounts? If so, how does (a) correlate with (b) and (c)?

Also, it is not clear whether a consumer is expected to "shop around" among competing companies for one willing to take a greater risk or charge a lesser premium. The words seem to provide that anyone ("every motorist") who feels aggrieved by the first offer can demand a full-scale hearing before an administrative law judge and subsequent rights of appeal as provided by the Administrative Procedures Act.

The expectations of the purchaser are not at all like expectations of a person shopping for the automobile, from which these new constitutional (?) rights spring.

other opinions and references)[7] upon this basic flaw in the principal opinion.

Therefore, I dissent in part and concur in part.

---

[7] Justice WILLIAMS attempts to legitimatize discussion of the due process sufficiency of the act's regulatory scheme by reference in fn 14 of his opinion to plaintiff counsel's statement at oral argument requesting this Court to utilize the briefs filed in the *Court of Appeals* "on *any issues* that were otherwise *inadequate* or *deficient* in this reviewing court". (Emphasis added.) There was no such issue before this "reviewing court" to be "inadequate" or "deficient".

(The only due process issue raised below concerning the act's regulatory scheme was based on the theory of an improper delegation of legislative authority. The entitlement doctrine and state action theories used by the majority today were not issues below.)